## DOUGLAS PECTIN CORPORATION v. ARMOUR & CO.

Circuit Court of Appeals, Second Circuit. August 20, 1928.

No. 219.

1. Patents ⟨⟩116—Patents for making jelly-making product of pectin, and improvements for using it, held sufficiently definite.

Patents involving a jelly-making product of concentrated pectin, and improvements for making and using it, held sufficiently definite as to disclosure.

2. Patents ⟨⟩328—1,082,682, for concentrated compound containing soluable pectin for jelly-forming substances, held valid and infringed.

Douglas patent, No. 1,082,682, for a concentrated compound containing soluble pectin for jelly-forming substances, held valid, unanticipated, and infringed.

3. Patents ⟨⟩328—1,304,166, for decreasing boiling time for making jelly by use of pectin, held valid and infringed.

Douglas patent, No. 1,304,166, relating to decreasing of boiling time for fruits, and making jelly by the use of pectin, held valid, unanticipated, and infringed.

4. Patents ⟨⟩62(3)—Very high degree of proof is necessary to establish anticipation by prior use.

A very high degree of proof is required to establish anticipation of a patent by prior use.

5. Patents ⟨⟩36(2)—Mere recollection of remote events should not be allowed to overthrow patent, followed by great commercial success.

Slight variations, due to imperfect recollection of old, forgotten, far-off things, and exaggeration of honest witnesses, induced by their interest or feeling of loyalty, ought not to be allowed to overthrow a patent, that has been followed by great commercial success, in a field where no approximation to its teaching can be found among prior patents or publications.

6. Patents ⟨⟩328—1,235,666, for jelly-making product and process of making it, held valid and infringed.

Douglas patent, No. 1,235,666, for removing from pectin, or jelly-making compound, the natural dissolved starch by use of diastatic enzym, and process of making it, held valid and infringed.

Appeal from the District Court of the United States for the Western District of New York.

Patent infringement suit by the Douglas Pectin Corporation against Armour & Co. From so much of the decree of the District Court (14 F.[2d] 768; 21 F.[2d] 584) as dismissed its bill as to alleged infringement of patents Nos. 1,082,682 and 1,304,166, on the ground of invalidity, complainant appeals; and from such decree, so far as it adjudged patent No. 1,235,666 to be valid and infringed, defendant appeals. Reversed as to patents Nos. 1,082,682 and 1,304,166, and affirmed as to patent 1,235,666.

Melville Church, of Washington, D. C., Arthur E. Sutherland, of Rochester, N. Y., and Clarence B. Des Jardins, of Washington, D. C., for complainant-appellant.

Louis L. Babcock, of Buffalo, N. Y., and William Nevarre Cromwell and A. B. Stratton, both of Chicago, Ill., for defendant-appellant.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge. The invention of patent No. 1,082,682 had for its object to provide a substance adapted particularly to be used in the making of jellies, jams, and preserved fruits.

A jelly-forming substance known as pectin is found in apples, as well as in other fruits. The specification says that the fruit juices should be expressed from the apples to remove the natural sugar, and the pulp or pomace should then be treated with a suitable solvent, such as hot or boiling water, to which might be added a suitable proportion of any suitable acid, to liberate the pectous proper-

ties of the fruit from the pulp. The specification goes on to say:

"The pectous liquors obtained from the fruit pulp are nearly devoid of all natural sugar, and I have discovered that the removal or separation of the sugar contents of the fruit from the pectous or jelly-forming substance renders these incapable of jellifying by themselves, and permits the liquor to be highly reduced or concentrated. To accomplish this and obtain the desired density, I evaporate, preferably in vacuo, the excess water and form a syrupy viscous extract. In using the latter, a given quantity thereof may be added to a simple syrup of sugar and water of proper proportion, depending upon the degree of concentration of the pectous product, whereupon the formation of a jelly immediately commences."

The claims relied on are:

"3. A concentrated compound of the character described, consisting of a syrupy viscous liquid, which contains soluble pectins or jelly-forming substances of fruit or vegetable origin, besides other characters derived from the raw material, such as small amounts of residuary sugars, acid, and mineral matters; its essential characteristic being its property of forming a jelly when combined with definite proportions of sugar and water.

"4. The process of producing an unsolidified pectous compound, consisting in treating a fruit or vegetable to remove the natural sugar therefrom, processing the remaining pulp in the presence of a solvent to extract the pectous substances and reducing the liquor thus obtained by evaporation to a syrupy concentrate."

Jellification is due to the presence in fruit juice of pectin and a fruit acid. When the slightly acid fruit juice is combined with pectin and has the proper amount of sugar dissolved therein until the sugar content is 58 per cent. or more, of the total, pure fruit jelly is formed.

Pectin is not present in all fruits. That is why, with the old method of adding sugar to the juice and boiling, it was impossible to make jelly with certain fruit juices, as, for example, pineapple. Moreover, the pectin content of fruits containing pectin decreases as the fruit ripens, and varies in different fruits and during different seasons. Hence the old methods were uncertain in result and difficult to control.

Douglas, the inventor, conceived the idea that, if pectin concentrate could be obtained of sufficient strength, it would be possible to add this concentrate to a mixture of fruit juice and sugar in proper proportion, and cause the mass to jellify without waste and loss of flavor from boiling. He also discovered that pectin itself, if substantially rid of sugar, would not solidify, and that it could be stored for use in making jelly at a future date. He expressed the juice from apples to rid them substantially of their natural sugar, so that, when the pomace was boiled down, there would be no sufficient sugar content to cause the concentrate to solidify, and he boiled the pomace to convert the pectin from insoluble to soluble form.

There is no doubt that his pectin met with very great commercial success, and that his product and process were contemporaneous with a revolution in the methods used by jelly manufacturers, and were employed by the defendant.

The real question is whether what he shows in this patent was substantially practiced by others before his time. The trial judge sustained the defense of prior uses, which was sought to be established by a great mass of testimony.

Patent No. 1,304,166 relates to a process for making jams and jellies with the pectin covered by the first patent referred to. The specification says:

"In the usual production of jams, jellies, and marmalades, the crushed fruit or fruit juices are boiled with sugar, or with sugar and water, in certain proportions, until the desired amount of evaporation takes place, and the whole is brought to such a consistency that, upon cooling, it will assume a jellied consistency. The serious objection to this process is that, as a result of the evaporation which takes place, a large proportion of the delicate flavor of the fruit is lost. In the usual manufacture of pure jams, jellies, and marmalade, the boiling of the whole mass is continued until from 25 to 40 per cent. of the fruit juice has been evaporated. This process not only causes a loss in volume and weight of the fruit, but necessarily greatly dissipates its natural flavor and aroma. Another disadvantage which results from prolonged boiling is the production of foreign flavors, due to the chemical changes which take place and further impair the natural flavors."

"The general directions for practicing my invention may be stated as follows:

"The fruit or fruit juice from which the conserve is to be made is mixed with a slightly larger proportion of sugar than would be required in the usual practice, where boiling takes place. The pectin is then added, and the mixture is heated to a sufficient temperature to dissolve the sugar and sterilize the product. The quantity of pectin necessary

depends upon the concentration of such substance and the richness of the fruit or fruit product in natural pectic properties. It may be stated generally that in practice the amount of the pectous substance to be added should be sufficient to combine with the surplus moisture in the fruit juices and the excess sugar to make a firm jelly.

"The following example of the proportions which may be employed in the manufacture of strawberry conserve will serve as one illustration of the proportions of the various ingredients which may be combined successfully:

"Assuming the use of a pectous solution of such strength that one part, when mixed with a syrup composed of four parts of sugar and two parts of water, will form a jelly, then I supply 4 pounds of this pectous solution in combination with 30 pounds of crushed strawberries and 40 pounds of cane sugar, which being treated as before described will combine to produce approximately 74 pounds of jellied strawberry conserve of commercial consistency.

"Substantially the same quantities of ingredients may be used to make a fruit jelly by using the expressed juice of the fruit, obtained by pressing the latter in either heated or cold condition. * * *

"The sterilizing of the fruit mixture is accomplished at a temperature lower than the boiling point, or before the fruit mass begins to boil, but no harm results if the product is brought to the boiling point, if it is not held at this temperature long enough to cause any considerable loss by evaporation. * * *"

The claims relied on are:

"2. The process of making jams or conserves consisting in adding to crushed fruit and sugar a concentrated pectous solution, heating the mass sufficiently to sterilize it without producing evaporation by prolonged boiling, and subsequently allowing the mass to cool."

"5. The process of making fruit jellies, consisting in adding to fruit juice a given quantity of sugar and a proportional quantity of concentrated fruit pectins sufficient to jellify the mass without prolonged boiling."

Patent No. 1,304,166, like patent No. 1,-082,682, was held invalid by the District Court on the testimony of the prior uses.

[1] Before the effect of the prior uses is considered, the contention must be met that the foregoing patents are invalid because of the indefiniteness of the disclosure. This defense was not sustained by the District Court.

The defendant says (1) that the degree of concentration of the pectin is not specified; (2) that the extent to which the natural sugar is to be removed from the pomace is not specified; (3) that it is not made clear whether the pomace is to be treated once or twice for the removal of the sugar; and, finally, (4) that the proportions of sugar to be added to the fruit or fruit juices are not specified.

(1) The directions of the specifications are, of course, addressed to persons skilled in the art, who know that, in adding pectin to fruit juices, the strength required depends on the pectin already contained in the fruit, which again varies with the character of the fruit itself, with the degree of ripeness, and even with the particular season.

The degree of concentration is defined by reference to the action of the pectin concentrate on sugar syrup. No other standard could be furnished. The specification in patent No. 1,082,682 says, at page 1, line 72:

"In using the" pectin concentrate, "a given quantity thereof may be added to a simple syrup of sugar and water of proper proportion, depending upon the degree of concentration of the pectous product, whereupon the formation of a jelly immediately commences."

Accordingly the pectin must be tested with a simple sugar syrup, to tell whether the concentration is sufficient. Defendant's witness Zimmerman testified that "a simple syrup is known in pharmacy * * * as a syrup having a Baume of 32 degrees. * * * Syrups might be made that show a Baume of about 36 degrees without crystallization." A sugar solution of 32 degrees Baume contains 59 per cent. of sugar, and one of 36 degrees Baume contains 67 per cent. The minimum strength of pectin will gelatinize with the maximum of sugar, and a greater concentration is necessary when the percentage of sugar is less. The pectin should, therefore, be concentrated until a jelly will form; when it is added to the syrup, which contains from 59 per cent. to 67 per cent. of sugar, one pound of pectin must carry about four pounds of sugar. Folio 2654.

(2) The next criticism is that the extent to which the natural sugar is removed is not set forth. The first patent says that the jelly-forming substance of fruit "is so prepared that it may be reduced or condensed in a liquid state without itself being hardened or jellified." It also goes on to say that the fruit juices that contain the sugar in apples may be expressed, or that the process of dif-

fusion with water may be employed. Thus the method of eliminating the greater part of the sugar is indicated, and the result that the pectin thereafter concentrated will not jellify is stated. This would seem to be clear enough. No claim of complete elimination of the sugar content is made, and the only elimination required is one sufficient to leave "a syrupy liquid, which contains soluble pectins," that will not jellify in itself after the pomace has been digested as provided in the patent, and will gelatinize without boiling when added to a simple syrup as above.

(3) The third criticism is that the directions of the first patent indicate that the fruit juices are to be expressed to remove, and the pomace is then to be processed to complete the removal of the sugar. The processing directed is not to remove the sugar, but to extract the pectin. We can see no obscurity or difficulty in the directions given.

(4) The contention that the proportions of sugar to be added in making the jelly are not indicated is substantially answered under (1), supra.

The process of the short boil patent is sufficiently clear for the same reasons. That patent says (page 2, line 20):

"The quantity of pectin necessary depends upon the concentration of such substance and the richness of the fruit or fruit product in natural pectin properties. It may be stated generally that in practice the amount of the pectous substance to be added should be sufficient to combine with the surplus moisture in the fruit juices and the excess sugar to make a firm jelly."

Some examples are later given, but, as the pectin varies in the fruit, an unvarying formula is impossible. The patent informs us that a pectin sufficiently concentrated "may be used to make a fruit jelly by using the expressed juice of the fruit obtained by pressing the latter in either heated or cold condition." Patent, p. 2, line 50.

That is a sufficient direction for practical dealing with the ingredients, and teaches any one skilled in the art how to proceed. It is enough that the patent tells us that with concentrated pectin a cold jelly can be made.

By the first patent, pectin was segregated to be used as a separate article of commerce. By the second or short boil patent, the trade was taught the process of using the pectin of the first in such a way as to avoid loss of the product by boiling, as well as injury to the fruit flavor. In other words, the trade was taught, not only how to use pectin in order readily to secure jellification, but also

how to use it so as to escape the bad effects of long boiling, which had been thought necessary in the earlier processes, in order to produce a sufficient concentration of pectin in the mixture to gelatinize it.

[2, 3] But it is insisted that the products and processes of both patents appear in the prior art, and so the District Court has held.

There is a mass of evidence that pectin was recognized as a gelatinizing substance long before the date of Douglas' first patent, that a concentrate of fruit juices contained it, and that this would sometimes keep without solidifying, and could be thereafter used to add pectin to a fruit juice for making jelly. But the first patent of Douglas taught how to manufacture pectin as a separate article of commerce, without the presence of any substantial amount of sugar, that would cause jellification of the pectin fluid after digesting the pomace, and with an almost complete deflavoring.

One of the prior uses especially relied on is that of Andrews. He was a manufacturer of jams and jellies in Brooklyn, who used large amounts of the Douglas pectin after it came on the market, and testified that it was preferable to his own concentration of apple juice, "in that the elimination of the sugars and starches and apple flavor did not interfere so much with the other fruit flavor." Record, p. 92. But he said that between 1885 and 1893 he mixed apple pomace from which the cider had been extracted with water, boiled it down, and put it up in sealed glass jars, and that it was thereafter made into jelly by mixing it with the juice of other fruits, such as strawberries and blackberries. He produced no records to fortify his recollection of this process of employing pomace, instead of apple cores, and testified, as did his foreman, Hoelzer, that from the year 1893, when the latter joined him, he used concentrated apple juice, and not juice of pomace, from which the sugar had been removed. Andrews said at the trial that Douglas' pectin was different from the apple juice he had previously used, "as it contained only the pectin, and not the sugars and the starches; * * * the elimination of the sugars and starches and apple flavor * * * did not interfere so much with the other fruit flavor."

We think the testimony, uncorroborated by any writing, as to the making of pectin from apple pomace and mixing other fruits with the juice back in the years 1885 to 1893, is much too unsubstantial proof to meet the severe tests required to establish a prior use. Andrews said that he discovered that the pec-

tin remained in the apple pomace after the juice of the apple had been expressed, that it could be extracted by boiling the pomace, and that if the pomace was boiled down sufficiently, and sugar added to the concentrate, there would be enough acid left in the pectin to form an apple jelly. He, moreover, says that his concentrated juice, which he stored, "was about the consistency of a light syrup," so that it apparently was not of the concentration to "form a syrupy viscous extract," as described in the specification of the first patent. It is altogether clear that there is no proof of a short boil process, and we are not satisfied that Andrews' testimony is sufficiently certain to anticipate Douglas. He stands alone and uncorroborated in his account of a process dependent wholly on personal recollection—a process which admittedly he had abandoned 30 years before in favor of the use of concentrated apple juice. Mere recollection as to such remote events cannot be allowed to defeat a patent.

The Clymer practices are also earnestly. relied on as anticipations. They were held to be such by the trial court, and are formidable answers to the claims of the first patent. Yet Clymer's company, like Andrews', was a large buyer of pectin made by the Douglas Company. Clymer undoubtedly accomplished something, and took a step approaching the Douglas invention. His work represented an approximation to the final achievement so common in patent cases, which was finally supplanted by a more scientific and useful process. If properly viewed, we regard the Clymer practice as really strengthening the argument in support of the validity of the patents.

In 1906 and 1908 Clymer made records in a book which he produced at the trial, showing entries that he cut up apples, pressed them, and took off the cider, recooked and pressed the pomace, and put the juice in five-gallon jars. Record, pp. 502, 503. He testified that the juice which he obtained from pressing the pomace "was taken right over to the jelly department and made into a finished jelly, sometimes pure apple; other times it was used in connection with other fruits; and at other times this juice was boiled down to 3 to 5 Baume, and put away in five-gallon cans or five-gallon jars for storage purposes. The juice which was thus boiled down and stored was of a syrupy consistency after it was cooled off, and by touch it had a sticky feeling. Some apples were better than others. This juice which was stored in the manner just referred to did not jellify of itself." Record, pp. 498, 499.

Now, it is quite clear that the juice obtained from pressing the pomace, without further evaporation, was not concentrated pectin. At least, there is no assurance and little probability that it was. It was taken over to the jelly department, and made into jelly (apple or fruit) by the necessary addition of sugar and boiling. Sometimes the juice was boiled and stored for future use. In this latter case it is nowhere shown that it would later make jelly, if introduced into a simple fruit syrup, without further boiling and consequent loss in bulk of the mixture and deterioration in flavor. Yet in the first patent in suit it is said that, upon the introduction of the concentrated pectin, "the formation of a jelly immediately commences." That is an outstanding characteristic of the Douglas invention.

The proof of any understanding or use by Clymer of a concentrated pectin having the practical efficiency described in the Douglas specification is too uncertain to defeat his patents. Indeed, Clymer testified that he boiled the mixture 10 or 15 minutes when he used the Douglas pectin, so that it is quite apparent that he had no conception of all the advantages of a concentrated pectin, and he produced no record showing the degree of concentration he obtained. He did testify that the pectin stored was of a "syrupy consistency," but uncorroborated recollection of the consistency of a pectin made 15 years before is not the sort of evidence that has been regarded as sufficient to establish a prior use.

There was also testimony that Clymer's stored juice did not jellify itself. That all depended, however, on its degree of concentration and the relative proportions of residuary sugar and fruit acid to pectin. The absence of jellification might merely indicate the slight concentration of the pectin and the slight evaporation of the juice. It did not establish a correspondence with the Douglas article, even if all the statements of Clymer be taken to have been correct. If Clymer is not shown to have anticipated the first patent, it is still more evident that his processes showed no understanding of the short boil process of the second.

The testimony as to the Kuehne prior use differs from that as to Clymer's process, in that it relates to a use of pectin from apple pomace to make pure fruit jellies of various kinds, whereas it is not entirely clear that Clymer applied his pectin thus made to more than apple juice. Kuehne was another user of the Douglas pectin. He said that he had employed his process, beginning in 1893, or 30 years before the time he testified. He

said that he treated "cores and skins just the same way that [he] had the apple pomace" (folio 1407). He said about the pomace after the fruit juice had been expressed:

"We dumped this pulp in a tank, added water to it, turned the steam on, and boiled it about 10 minutes, drained it, and repressed it, and the juice was boiled down to a certain degree and stored away for future use in most instances. * * * When I stated that the juice was boiled down to a certain degree, I mean a certain degree sugar test. * * * The juice was boiled down to from 10 to 15 Baume." Folio 1382. "In making jellies from this boiled-down juice, it was heated, glucose or sugar added. * * * I don't think we boiled the boiled-down juice. I think we heated it to about boiling. * * *" Folio 1384, 1385.

The business of making jellies seems to have stopped with bankruptcy in 1916 and to have been very slight, and perhaps not to have continued at all after 1909, when there was a fire which burned the factory. Kranz, an employee of Kuehne, testified to much the same effect, except that he said they did not use cores and skins in making apple juice, and that he never did any cooking of the pectin fluid after the fire in 1909. He added that the juice from the pomace was boiled down for four or five hours. Shakley, another employee who was not produced, is said to have made the jelly before the fire.

Neff, who furnished the most important testimony, was only 14 years old when he began to work for Kuehne in 1914. He said that they would boil down the juice 10 to 15 Baume scale, and 8 barrels coming from the second pressing of the apples would be required to make a barrel of the boiled-down juice, and that this juice would not jellify itself. He said five pounds of sugar were used to a gallon of apple juice, and enough fruit juice added to flavor it, and the whole just brought to a boil. He also said that the fruit juices used in making pure fruit jelly were apple juice, strawberry, blackberry, and raspberry. Neff said that he helped the cook make the fruit jellies from 1905 until 1909— that is, from the age of 15 to 19 years—and that after the fire he did the work himself. The manufacture of jelly after the fire was small, if it was carried on at all.

Now Neff was very young when everything said to have been done prior to the fire occurred, and after that the making of jelly at the Kuehne plant seems to have been most doubtful. Moreover, everything ceased upon the bankruptcy of the business in 1916, so that in any event the latest possible transaction with which he was connected was 7 years before the time he testified in 1923. Furthermore, he said that 5 pounds of sugar were added to 1 gallon of the boiled-down pectous fluid to make jelly. This would be 1 pound of sugar to about 9 pounds of the fluid. Dr. Bancroft regarded pectin of a concentration whereby 1 pound would carry 4 pounds of sugar as a proper proportion in order to make a jelly without boiling, whereas 1 pound of Neff's pectous fluid carried only about one-half a pound of sugar. This indicates that the Neff pectin was so weak that it must have required prolonged boiling to concentrate the mixture sufficiently to gelatinize it. Neff also said that his mixture consisted of 9 pounds of apple juice to 5 pounds of sugar, making a sugar content of only 30 per cent. According to the testimony a standard jelly should have a sugar content of at least 58 per cent. Therefore a mixture of only 30 per cent. sugar must have required prolonged boiling. Such testimony, uncorroborated by records, cannot establish a prior use. Kuehne evidently preserved in substance the old long-boiling process, used no concentrated pectin, and anticipated neither patent.

The Sprague, Warner & Co. process was also regarded by the trial court as similar to that of the patent in suit. But they did not eliminate the sugar by expression of the juice from the fruit, and then cook the pomace and make a concentrated pectin free from sugar. On the contrary, they merely concentrated the fruit juice, natural sugar and all, and used the concentrated compound to add to fruit juices and make jelly. Such methods would not produce a pectin of a high degree of concentration, in essentials resembled the old boiling processes, and did not correspond with those of Douglas. No desugarized concentrated pectin, as a separate substance, was produced by Sprague, Warner & Co. Their process did not fall within either patent.

The Williams-Charbonneau practice likewise fails to come within the Douglas patents. Apple pomace was cooked, sugar added, and apple jelly thus formed. Enough residuary acid was left in the pomace to form a jelly, when it was concentrated by cooking and sugar was added. The pomace also apparently still had enough flavor to make a palatable jelly. Concentrated pectin, as a separate substance, was not added to fruit juices in the way Douglas taught. Williams testified that: "This juice, extracted from apple waste and apple pomace, was used in making jellies. It was the only ingredient

that was used outside of the glucose. In making the preserves, it was added to the fruit to make the preserve that was known as an apple base preserve." Folio 1575. It is nowhere, however, shown that the juice from the cooked pomace was used as a separate desugared concentrated pectin, and the testimony of events happening at least seven years before is supported by no book entries, formulæ, or other documentary evidence.

The Pillman uses were also brought forward as anticipations of the Douglas inventions. These were not verified by any documentary proof bearing on the process. J. Howard Pillman described matters which had occurred about 30 years before. He doubtless used gelatinizing juices taken from apple cores and skins, as well as from pomace cooked and pressed. He evidently boiled this juice after he had stored it for future use, in order to give it a sufficient strength so that it would make jelly. Folios 1242, 1243. The testimony indicates a knowledge of what was the common understanding, that a pectous fluid would gelatinize a fruit juice, but does not show that Pillman knew how to produce a standard concentrated pectin that would uniformly form jelly without boiling. Henry Pillman described a pectous fluid that was made by cooking the pomace. This fluid was then put into a kettle and concentrated, sweetening material and phosphoric acid were added, and jelly formed. Fruits were sometimes combined with this to make a jam, with an apple jelly base, and the whole boiled down 25 minutes further. Alexander McLean and James Profit, who worked for one of the Pillman companies, said that, after the pomace was cooked and expressed, they concentrated the juice and stored it for further use. McLean said, when they added the ingredients, they only brought the mixture to a boil.

The Pillmans, like the others, were approximating the Douglas processes, but the testimony as to their processes is indefinite as to the concentration of pectin and unsupported by any formulæ or other records. They knew how to obtain a pectous fluid, and afterwards to boil this to make jelly or jam when sugar was added. The testimony of McLean would perhaps indicate that short boiling at times occurred, but it related to matters that occurred at Ayer 15 years before, and may have been incorrect, or may have depended on the accidental strength of the fluid. Such proof is not strong enough to defeat a patent, which prescribes a definite method and indicates no appreciation of the advantages of a *standard concentrated*

*pectin* used as a separate article in jelly making. The Pillmans used in the same way pomace and apple cores and skins from which the juices and sugar had not been expressed. They showed no understanding of the necessity of substantially ridding these of their sugar content, and of producing a concentrated pectous fluid that would in general gelatinize without boiling. Moreover, all the proof is oral, and is of transactions from 15 to 30 years old.

The practice of Toohey at Barnesville is also irrelevant. He cooked apple pomace, and then combined sugar with the juice, and boiled down the mixture, and stored it for future use. The testimony related to transactions about 25 years before, and did not indicate the use of a desugared pectous fluid.

The Crawford practices, while not set up in the answer as an anticipation, were relied on by the trial court. But they did not in any event foreshadow the Douglas patents. Crawford obtained a pectous fluid from apple pomace and stored it, but it was not a concentrated pectin. It was afterwards mixed with sugar and fruit juice, and the whole was boiled down. The concentration occurred in this mixture, and was never completed in the beginning, so as to form the product of the first Douglas patent. Crawford, who was an employee of the American Fruit Company, said of their process in 1910: "We did not make concentrated pectin." Folio 1943. He said that he further concentrated the pectous fluid in 1911, before introducing it into the mixture, but he then boiled the mixture. In 1912 he simply operated on a larger scale. He said: "The length of time we boiled the jellies in 1912 varied greatly." Folio 1962. This shows no standard of concentration.

Of course, every pectous fluid is more or less concentrated; but not every such fluid will gelatinize a properly sugared fruit juice without further concentration by boiling. It is strange, if the prior uses relied on by defendant went on, that Crawford, a consulting chemist, who was with the American Fruit Company as early as 1904, should say that "prior to * * * about 1911 I had never seen or heard of a concentrated desugared pectin." Boiling a pectous fluid, and then storing it for further boiling with fruit juices and sugar at a subsequent date, to make jelly, is far from the process of making a concentrated pectin of a critical concentration, such as Douglas has described. Furthermore, there is strong evidence that Douglas had perfected his invention in 1910, before Crawford had practiced his process.

This is fortified by the written formula, of which the witness Roser kept a copy. Folio 2612.

[4, 5] The defendant relied on proof of prior uses, rather than prior patents, to establish anticipation and lack of invention, and we have discussed the prior uses pointed out upon the argument, as well as some others, at tedious length, because it is upon these, if upon anything in its defense, that the defendant could hope to win. The case is not simple or entirely free from doubt, particularly in view of the findings as to the prior uses of the experienced trial judge. But the situation we have had to deal with shows the soundness of the rule, which requires a very high degree of proof in order to establish anticipation of a patent by a prior use. Here the defendant has not offered a particle of written evidence to establish the uses it relies on. Most of them are very old. They deal with a process in which matters of slight detail, such as the degree of concentration of the pectin, the proportion of sugar, and the time of boiling are of critical importance, and might make all the difference between the old practices and the new invention. Slight variances, due to imperfect recollection of "old, forgotten, far-off things," and the exaggeration so often seen among honest witnesses, induced by their interest or feeling of loyalty, ought not to be allowed to overthrow a patent that has been followed by so much commercial success in a field where no approximation to its teaching can be found among prior patents or publications. The Barbed Wire Patent, 143 U. S. 275, 12 S. Ct. 443, 450, 36 L. Ed. 154; Deering v. Winona Harvester Works, 155 U. S. 286, 15 S. Ct. 118, 39 L. Ed. 153.

In a case where almost any pectous juice will gelatinize, if other conditions are adequate, accurate contemporary records of practices corresponding with those of Douglas should be produced, when it is sought to defeat his patents. Whether the pectous fluids of the prior uses met the tests of the patents in suit should not be left to memory. In the records of these large jelly manufacturers, who have testified for the defendant, surely some well-authenticated formula would have been produced, showing definitely the anticipation of Douglas' invention, unless he had really contributed some new thing to the art. The purchase by the defendant itself of more than 360,000 gallons of the Douglas pectin during the five years before it began to infringe by adopting the Douglas processes is alone strong proof of invention.

Zimmerman, defendant's chemist, significantly remarked:

"The Douglas product was an entirely new product to me at that time. I did not appreciate at that time the fact that by the use of this concentrated pectin the time of boiling or cooking fruits and the fruit juice and the manufacture of jellies and jams would be materially reduced, saving the flavor and aroma of the fruit." Record, folio 2211.

Even taking the prior use depositions as they stand, they contain but little evidence of a concentrated pectin for general use in making jellies from divers fruits. Most of the testimony relates to obtaining pectous fluid from apple pomace, boiling it down, and storing it for future use in making apple jelly. If sufficiently boiled, it will gelatinize itself, when sugar is added, because it contains a sufficient residue of fruit acid, in spite of the elimination of much of the juice when the apples were first pressed. The process of concentrating pectin to a point where it could be used with the juices of any fruit to gelatinize the mixture of these juices and sugar was first clearly taught by Douglas.

We hold patents Nos. 1,082,682 and 1,304,166 valid and infringed.

[6] The last patent for consideration is No. 1,235,666, embracing the invention of Douglas to remove from pectin the natural dissolved starch. After describing his process for making a concentrated pectin he says:

" * * * I have found that the starch content in the concentrated liquid possesses an apparent affinity for the tannin constituents of the fruit, after the solution has been allowed to stand for any considerable period of time, which produces a cloudiness or turbidity in such solution. Many clear jellies are made for the market, consisting of fruit-flavored syrup, and in the manufacture of such jellies the bulky starch precipitate, described above, might be objectionable in the higher grades of products, owing to the somewhat imperfect solubility of such discolored starch elements. The latter may be removed from the pectous extract, and the method which I preferably employ for accomplishing this object consists in treating the weak pectous liquor with a suitable starch-converting enzym, such as malt diastase, in such a manner that the starch content in the liquor is converted into a sugar, or carbohydrate, such as maltose, or dextrose, which do not combine with the tannins of the fruit to form a precipitate. The liquor thus treated may be filtered, for the purpose of

completing the clarification, and thereafter evaporated, to form a syrup of any desired viscosity, without any tendency being exhibited to form a precipitate." Patent, p. 1, line 86.

The specification goes on to describe the manner of treatment of the weak pectous liquor, using malt diastase as an example:

"By way of example, in case malt extract is used for conversion, take 100 pounds of fairly clear liquor as it comes from the filter press, and cool to a temperature of about 135° Fahrenheit. Diffuse in this quantity of liquor the cold water extract from one pound powdered barley malt, or its equivalent in crushed green malt extract, and allow the reaction to proceed until a sample of the liquor after being filtered (bright) no longer gives a blue or purple reaction when tested with iodin solution, when only a red or yellow color reaction is obtained by this test, the soluble starch has been converted. This conversion may be accomplished in one or two hours." Page 2, line 5.

A representative claim reads as follows:

"6. A pectous compound, from which the dissolved natural starch has been removed by its conversion into sugar by the action of a suitable diastatic enzym."

Various other claims for a pectous concentrated compound, as well as for the process of producing it, are also made.

The trial judge held the patent valid and infringed. There is no proof that any one prior to Douglas used his method of eliminating starch from pectin, so as to clarify the product, and there can be no question about defendant's infringement. Zimmerman said:

"We did not begin to use an enzym from the start. The material was not on the market for a very long time before we had some difficulties in our equipment in handling the pectin, which necessitated our going to a diastatic enzym. It would be about the spring of 1922, if I recollect correctly."

But it is earnestly contended that the patent lacks invention, because it was known that apples contained starch, that the presence of starch might be determined by the iodine test, and that malt diastase would convert starch into sugar.

All these things seem to be true, but they do not preclude invention in this case. If Douglas is to be believed, he spent much time in dealing with the problem of the brown precipitate which developed in his pectin concentrate. He suspected the presence of starch and tannin. He tried to convert the starch by hydrochloric acid. That converted the starch, but also destroyed the gelatinizing properties of the pectous fluid. He then tried to get rid of the tannin by letting the juice stand in cotton, with the idea that cotton would absorb it, but without success. He then tried diastase on the pectous fluid before it was concentrated and at a time when there was no precipitation, and after concentration the pectin never became cloudy.

Now, it is said that Douglas should have known all this from the state of the art, and ought to have done what he last did in the beginning. But Dr. Charles A. Brown, Chief of the Bureau of Chemistry of the United States Department of Agriculture, and defendant's witness, said:

"I am not able to say what the effect would be of boiling with acid, referring to a solution obtained by boiling apple pomace with water and acid. I know, of course, what the effect would be on boiling after I had precipitated the starch from the washed solution. That was done entirely as an analytical procedure. If the precipitate that was obtained from the solution, after concentration, were brownish in color, I would not assume that that was starch until I had made the iodine test. I have no familiarity with any compound of starch and tannin. My examination was made entirely on the starch which had settled out from the filtrate, and it showed the definite formation of the starch granules of the apple. I have made no experiments on the question whether tannin is what is known as a poison for diastatic enzymes. I am not able to express an opinion on that question." Folios 2352, 2353.

Here was a problem of ridding pectin, concentrated by boiling in which an acid was present, of a brown sediment which would discolor the jelly afterwards. It was not simple to Brown, a specialist on starch. It seems difficult to say that Douglas should have had ready means for a proper solution. Thomas, an expert called by Douglas, said that he would not have expected a diastatic enzym to remove the precipitate, for *tannin* is an enzym poison, and he did not know the effect of an enzym on a compound of starch and tannin. He also said:

"One would be obliged to experiment with diastase in order to determine whether it could be used to decompose starch without damaging the pectin, for the reason that, while diastase will hydrolize starch, it will also hydrolize pectin; therefore, one would have been obliged to make careful experimentation with diastase in order to determine the proper amount to use, so as to remove the starch and not to damage the pectin. In my opinion, the preliminary treatment of a

clear, dilute, pectous liquor to remove dissolved starch, and thereby eliminate the possibility of the precipitation of a starch tannin compound subsequently upon concentration, was new to the science of chemistry." Pages 903, 904.

Douglas did not treat the pectin itself, because he found the acidity too high for the diastase to work, but went back to the weak solution, before the boiling and consequent concentration had occurred, and applied the enzym to it. He thus was able to convert the starch into a sugar that would not combine with tannin, and to avoid all future difficulty. He had the imaginative skill to go back of the immediate trouble that he found in the pectin to the real source of it all, and the inventiveness to devise a method which would remove the starch long before it could precipitate and combine with the tannin. No one had done this before, and there seem to have been no a priori grounds for feeling confident that the experiment would work.

While some processes of reason pointed to the method finally adopted that does not indicate that Douglas was following a plain course. Few patents could stand, if courts required inspiration, and precluded ingenious reasoning as the basis of the so-called "inventive idea." Thomas said that he would have thought the deposit was decomposed pectin. Its color did not indicate starch, which is white. It is easy enough now for some chemist to say that the diastase would plainly solve the problem; but Thomas would have thought differently, Brown would have been uncertain, and Douglas only cleared the fluid by imagination and experiment. That was invention, and because of it we hold the patent in question valid.

The three Douglas inventions were followed by an unusual trade response. The Douglas Company sold pectin in bulk to the amount of about $4,500,000 during the first 11 years after the product was put on the market. Bottled pectin was put on the market in 1921 for household use under the trade-name of Certo, and about $5,240,000 more was sold during the next four years. While $1,000,000 was spent in advertising Certo, about $3,500,000 of pectin was sold in bulk to jelly and jam manufacturers, at what would seem to have been a very small expenditure for advertising—probably not exceeding $50,000.

The old practices of boiling apple pomace to a certain point, and then storing it, to make either apple jelly or a jelly of apple and added fruits, was different from the Douglas invention. It was in substance an arresting or postponement of the jelly-making process, so as to have a large amount of apple juice ready in the off-fruit season, or, indeed, at any time, with which to make jellies or jams. It was not a conscious making of pectin at all, except as all jelly makers had in mind that apple pomace contained insoluble pectin, and that it could be made soluble by cooking the pomace.

Douglas first made pectin proper as a separate commercial article, desugared and deflavored, for use in gelatinizing all fruit juices. He first taught how to use it so as to avoid loss of bulk and flavor from boiling the fruit mixture, and he first discovered the means of freeing pectin from troublesome precipitations.

The decree is reversed as to patents Nos. 1,082,682 and 1,304,166, and affirmed as to patent No. 1,235,666.