## In re LILIENFELD.

### Patent Appeal No. 3201.

Court of Customs and Patent Appeals.
Dec. 30, 1933.

Newton M. Perrins and Daniel I. Mayne, both of Rochester, N. Y. (Henry S. Boynton, of Rochester, N. Y., of counsel), for appellant.

T. A. Hostetler, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

LENROOT, Associate Judge.

This is an appeal from a decision of the Board of Appeals of the United States Patent Office, affirming a decision of the Examiner, rejecting, for want of invention, claims 15 to 18, inclusive, and claims 25, 26, 27, and 38 of appellant's application, No. 436,604, filed January 11, 1921.

Claims 15, 17, and 25 are illustrative, and read as follows:

"15. Alkali cellulose containing substantially over 60% caustic alkali, and not substantially less than 13% of water.

"17. A moist alkali cellulose containing substantially over 33% of caustic alkali, and not substantially below 17% of water, the amount of water therein being insufficient to dissolve all the caustic alkali.

"25. An alkali cellulose containing between about 13, and 20% of water, and between 54.5 and 65.5% of NaOH."

██ Appellant's application relates to alkali cellulose and the process of making the same. Certain process claims were allowed. All of the claims here involved are product claims.

The reference relied upon is: Dreyfus (Fr.) 462,274, January 23, 1914.

This reference relates to alkali cellulose and a process for making the same. We shall hereinafter discuss some of the details of this patent.

The Examiner rejected the claims here involved upon said Dreyfus patent and the admitted prior art. The Board of Appeals in its decision makes no reference to admitted prior art.

██ Under the rule declared in the case of In re Wagenhorst, 64 F.(2d) 780, 20 C. C. P. A. 991, that an affirmance by the Board of Appeals of a decision of the Examiner has the legal effect of a rejection upon the grounds and references cited by the Examiner, not expressly reversed by the Board, we are at liberty to consider any ground of rejection by the Examiner, as well as the reference Dreyfus.

There are two questions before us for determination:

1. Whether the proportions of water stated in the claims render them patentable.

2. Whether the proportions of caustic alkali stated in the claims render them patentable.

It is the contention of appellant that the prior art taught that alkali cellulose should have no water content, and that he, appellant, discovered that by providing a water content ranging from 13 to 20 per cent., and substantially over 33 per cent. of caustic alkali, combined with cellulose, a new and useful product was produced which is patentable.

As hereinbefore stated the Examiner rejected the claims upon the Dreyfus patent and the admitted prior art. The admission, if any there be, lies in the preliminary part of appellant's specification, reading as follows:

"Be it known that I, Dr. Leon Lilienfeld, of Podhajce, Poland, a citizen of Poland, residing of 1 Zeltgasse, Vienna VIII, Austria, have invented certain new and useful improvements in and relating to manufacture of alkali cellulose, of which the following is a specification:

"For many purpose—, for example, for carrying out chemical reactions, such as the alkylation or aralkylation, arylation, or the like of cellulose, sodium celluloses are used, which are homogeneous and *contain only small quantities of water and a large excess of caustic alkali.*" (Italics ours.)

The pertinent portions of the Dreyfus patent read as follows:

"* * * The present invention relates to a perfect and simple method of producing true cellulose esters, such as methyl, ethyl, etc. ethers, if the reaction is carried out by means of alkalies, such as sodium and potassium, by using about two to three and up to four molecules of sodium or potassium, diluted in water or other suitable solvent, for each molecule of cellulose. These alkalies should be diluted to such degree as to permit complete and homogeneous impregnation of the cellulose or its derivatives used. This distribution may also be effected by impregnating with a more highly concentrated solution of alkali and drying down to a predetermined percentage, until the above indicated quantity of alkali is distributed uniformly in the cellulose. As soon as the cellulose has been impregnated with the above indicated quantity of alkali the water is evaporated by means of a vacuum, and preferably a very high vacuum. This evaporation may be accelerated by heating, although this is unnecessary, as the water will pass off in a perfect vacuum. In this manner it is possible to remove the water completely or approximately so and obtain cellulose salts which, by reason of the absence of water, can no longer decompose

into their constituents, since the alkalies are forced to remain on the hydroxyl groups, and by using the present etherifying agents it is impossible for etherification to proceed in another way except by combining with the hydroxyl groups of the cellulose."

Under the head of "Summary," the patent states:

"The invention comprises:

"(a) As a novel process:

"1. The process of preparing etherified derivatives of cellulose and its allied products, whose hydroxyl groups are etherified by alcohols, such as methyl, ethyl, etc. alcohol, consisting in: (a) that the cellulose and its allied products are suitably impregnated with a dilute solution of sodium or potassium in quantity such that for one molecule of cellulose use is made of two to three and up to four molecules of the alkalies, which are used and diluted in such manner as to assure homogeneous distribution; (b) that the water *is* then *more or less* completely removed by vacuum, preferably very high; (c) that etherification is then effected by etherifying agents, such as dimethyl sulfate, ethyl chloride, methyl chloride, ethyl sulfate, etc., quantities of from 2 to 3 and 4 molecules of the etherifying agent being used for one molecule of cellulose, according to the desired properties of the etherified cellulose to be produced, with or without suitable diluents, such as benzol, etc., at temperatures below 100° Celsius, and preferably not above about 50 to 60° C., the products obtained being separately off according to generally known methods." (Italics ours.)

Both the Examiner and the Board of Appeals held that appellant's specification, as originally filed, made it clear that appellant regarded the product produced by his process as old, and that his only invention was in the process of producing an old product.

At the time of the original filing of the application, no product claims were included. These were added on December 22, 1921, nearly one year after the filing date of the application. At that time, however, there were no amendments of the specification affecting in any material way the question of the amount of water or caustic alkali in the process. It was not until July 17, 1923, that the specification was amended by the insertion of the following:

"The water above referred to, which is added to the cellulose as such or in the form of a caustic alkali solution, exerts a certain solvent action on some of the solid caustic alkali added in the second step, and a certain minimum amount of water is necessary in all cases to form alkali cellulose by the operation of intimately incorporating the alkali and cellulose. The minimum amount of water necessary for this purpose is generally somewhat above 10% of the entire mass *during the step of incorporating,* and even higher when very large excesses of caustic are to be used. If a substantially lower percentage of water were present *during this step,* a part of the cellulose would not combine with alkali to form alkali cellulose." (Italics ours.)

The Examiner's statement contains the following:

" * * * As a distinctive feature over the patent disclosure applicant relies upon the apparently higher water content of his alkali cellulose, the lowest value of this factor being assigned as not substantially less than 13% of the amount of the cellulose. This difference however was held to be one of degree only and does not constitute a patentable distinction over Dreyfus for the following reasons; by his own disclosure (page 1, lines 1 to 10) applicant clearly admits that an alkali cellulose containing only a small quantity of water and a large excess of caustic alkali is old and the fair inference to be drawn from the language of the description as filed is that applicant regarded his invention as residing in an improved *process* for producing a product admittedly old in Dreyfus. That the water content of the instant product was somewhat greater than that of the product of the patent appears to be only a necessary factor incident to the use of a mechanical press in place of the more expensive prior art means of drying in vacuo, i. e., applicant was attempting to produce an old product in a less expensive way. There is not the slightest indication in the original disclosure that the water content is of importance, other than that it should be low, and there is absolutely no suggestion that there might be a *critical* lower limit of water content. This latter feature was first introduced into the case by the amendment of July 18, 1923; and in an apparent attempt to distinguish over the reference applicant there stated that "The minimum amount of water necessary * * * is *generally* somewhat above 10% of the entire mass during the step of incorporating." This generalization however does not show that 10% is a critical value any more so than does the claimed value of "not substantially less than 13%," since aside from this bald statement there is nothing of record indicating

that distinctively new results are obtained when the assigned limit is exceeded. * * *

"In summary; the alleged differences in the relative amounts of water and caustic alkali contained in the alkali cellulose, being differences in degree only, cannot be relied on to patentably distinguish over Dreyfus, and the invention therefor *in* in an improved *process* of making alkali cellulose and not in the resulting *product* shown to be old. * * * "

The Board of Appeals in its decision stated:

"These claims can be read upon the examples given in the original specification but there is not a word in said specification which indicates in any way that the proportions used in the examples are to be taken as establishing either maximum or minimum limits and this was specifically stated in an amendment made on page 4 after line 10 by paper No. 14.

"The appellant urges that this position is fallacious not only because it ignores the well known principle that an applicant need not originally explain the reason for his invention but because it overlooks the importance of the combination of a specified water content with a designated alkali content. This argument is not in point for he never disclosed originally that it was material to his invention that he should have any water at all in his product, much less a minimum limit. So far as his specification set forth his invention he might have reduced the water to 5, 3, or 0% without affecting his reaction.

"The brief also asserts that when the decisions in Interference No. 50,553 were rendered there was a statement in his specification that *a certain minimum amount of water* is necessary in all cases to form alkali cellulose, etc. Even if this be so, it was introduced by an amendment after the case was filed and further, it does not say how much water and certainly it does not fix a minimum of 13%.

"The parties Dreyfus and Lilienfeld were involved in a series of interferences Nos. 50,-553, 50,554, and 51,375 and in No. 50,553 a number of claims similar to those now under consideration were before the Board of Examiners-in-Chief and the First Assistant Commissioner, which claims were held unpatentable over the Dreyfus French patent No. 462,274 on the ground that the differences in the proportion of alkali and water to the cellulose were not differences in kind but only in degree and it was also pointed out that there was no basis in the Lilienfeld specification as filed for the limitations to the proportions of alkali or that of the water to not less than 13%.

"The whole teaching of both Dreyfus and Lilienfeld was to get rid of water, but this was difficult to accomplish and in the examples given in the Lilienfeld application there may have been more water than in Dreyfus where the water was removed by drying in vacuo instead of the less efficient mode of mechanical pressure adopted by Lilienfeld as more economical."

Inasmuch as appellant's amendments to his specification, made July 17, 1923, were allowed, we do not think that they can now be regarded as new matter not to be considered in passing upon the patentability of the product claims.

We are in accord with the view of the tribunals of the Patent Office that the application, as originally filed, did not disclose any invention of a new alkali cellulose product, and we are of the opinion that the amendment relating to the amount of water employed in the last step of appellant's process in no way indicates that distinctively new results are obtained in the *product* when the proportions of water named in the claims are contained in such product.

There is nothing in said amendment, hereinbefore quoted, indicating that a minimum of 10 per cent., or any other percentage, of water is necessary or desirable in the *product* of the process. It is stated that a minimum amount of water, generally somewhat above 10 per cent. of the entire mass, is necessary "to form alkali cellulose by the operation of intimately incorporating the alkali and cellulose," and that the presence of this water is necessary *"during the step of incorporating"* (italics ours), and, finally, "if a substantially lower percentage of water were present *during this step,* a part of the cellulose would not combine with alkali to form alkali cellulose." (Italics ours.)

Thus it is seen that the specification discloses that the specified minimum amount of water is necessary in *carrying out the process* disclosed, but there is nothing anywhere in the specification to the effect that the alkali cellulose secured by the process is any different, except in degree, from the alkali cellulose known to the prior art.

In support of this conclusion we note that, immediately following the amendment hereinbefore quoted, the specification recites that:

"By the present process alkali cellulose very poor in water and containing any de-

sired excess of alkali may be obtained in a quite simple manner."

The specification, in the first two paragraphs hereinbefore quoted, recites that alkali cellulose containing only small quantities of water and a large excess of caustic alkali was old.

Furthermore, the Examiner found that the alkali cellulose produced by the process disclosed by Dreyfus would probably contain from 5 to 8 per cent. of water, and might well contain a greater amount.

It is well established that, while a change in the proportions of a combination shown to be old, such as is here involved, may be inventive, such changes must be critical as compared with the proportions used in prior processes, producing a difference in kind rather than degree. In re Richter, 53 F.(2d) 525, 19 C. C. P. A. 756; In re Wells, 56 F.(2d) 674, 19 C. C. P. A. 1044.

The Examiner expressly found that the proportions of water designated in the claims were not disclosed to be critical, and the Board of Appeals impliedly made the same finding. Its affirmance of the decision of the Examiner, as hereinbefore noted, has the legal effect of a rejection upon all the grounds relied upon by the Examiner which were not expressly reversed by the Board, and therefore we are at liberty to regard the finding of the Examiner with respect to the proportions of water designated in the claims being critical.

We hold that upon the record before us the product resulting from the proportions of water designated in the claims differs from the product known to the prior art only in degree and not in kind, and therefore the proportions of water designated in the claims do not render them patentable.

With respect to the proportions of caustic alkali designated in the rejected claims, it does not appear that they are critical, and therefore they do not aid patentability of the claims, in view of the prior art. The Examiner stated:

"Applicant further contends that the claims at bar distinguish over the reference by defining as a product an alkali cellulose the caustic alkali content of which exceeds that of the reference product. Here again the reference is held to be a clear anticipation since by comparison the products differ only by degree and not in kind. Dreyfus discloses an alkali cellulose made up of 162 parts of cellulose (1 mol of $C_6H_{10}O_5$) to 160 parts of NaOH (4 mols) or to 224 parts of KOH (4 mols), the last two components may be in slight excess. Considering cellulose and NaOH alone, the alkali cellulose of Dreyfus would contain about 50% cellulose and about 50% NaOH. Applicant's product according to claim 25 may contain about 39% of cellulose to about 61% NaOH. However applicant's specification does not state that these proportions are material or that they are novel, and in view of the wide limits of proportion shown by the prior art it is evident that the skilled chemist in working out the Dreyfus process would vary the caustic alkali content and would in all probability operate within the limits set forth by applicant. The difference in this respect therefore is also one of degree rather than kind and as such it cannot confer patentability."

We are in accord with the view that, upon the record before us, the product resulting from the claimed proportions of caustic alkali, water, and cellulose, differs only in degree and not in kind from the product shown in the Dreyfus reference, and hence these proportions present no ground of patentability of the claims here in issue.

Appellant has been allowed claims for his process. As we view the record, the product claims here involved were properly rejected by the Board of Appeals, and its decision rejecting such claims is affirmed.

Affirmed.