**KWIK–SET, Inc., v. WELCH GRAPE JUICE CO.**

No. 1870.

District Court, W. D. New York.

March 20, 1936.

Parkinson & Lane and George Mankle, all of Chicago, Ill., and John S. Powers, of Buffalo, N. Y., for plaintiff.

Leonard S. Lyon, of Los Angeles, Cal., and Richard W. Treverton and Bean, Brooks, Buckley & Bean, all of Buffalo, N. Y., for defendant.

KNIGHT, District Judge.

This is a suit for infringement of patent No. 1,646,157, issued to Herbert T. Leo October 18, 1927, for a "Dry Powdered Jelly Base Containing Pectin and Sugar." Plaintiff is the owner of the patent in

suit. Defendant sells a dry powder jelly base under the name "Welch's Powdered Jel-Aid." It is this product which is claimed to infringe.

The patent includes four claims. Each is directed to a jelly base. The specifications recite that "an object of the invention is to provide a convenient and quick method for making jelly and to eliminate any guesswork in the use of powdered pectinous substances." The original application for the patent, filed March 14, 1922, included thirteen claims. All claims were at first rejected by the Patent Office as lacking invention over Barker, No. 1,386,224, in view of Boyles, No. 1,067,-714. On October 1, 1923, claims 5 and 11 were amended, and are claims 1 and 2, as they appear herein. Claims 3 and 4 were added, and all other claims of the original application canceled. Claim 3 was first rejected, but approved after amendment. On January 5, 1924, the Patent Office declared an interference between the aforesaid application of Leo and the application of Douglas et al. filed April 23, 1923, No. 634,151, involving claim 4 herein and copied by Douglas et al. for the purpose of the interference. The Examiner of Interferences decided in favor of Leo. This decision was affirmed by the Board of Examiners on October 12, 1926. Certain litigation involving rights in the application delayed final application for the patent until the time of its allowance.

The first essential element of a fruit jelly base is a substance known as pectin. The first two claims in suit are directed to a combination of pectin and sugar with or without an acid mixed within certain critical ranges, the purpose of which is to render the pectin soluble when mixed with the other component parts of the jelly. The third and fourth claims are directed to what is termed "standardization," by which is meant the production of a jelly base of determined unit quantity which will have definite predetermined jellying capacity. The invention is characterized by the plaintiff as disclosing "solubility" plus "standardization in the presence of solubility." It is claimed by the plaintiff that, by virtue of this invention, we have a jelly base which may be put out in any number of packages, in any size, with the pectin in the packages varying in jellifying strength, but the entire jelly base having a determined jellifying strength, whereby, under a standard recipe, a definite quantity of jelly can be made.

Chemical reactions furnish some of the most outstanding wonders of the physical world. Many commonplace substances contain within themselves mysterious creative energies when used in combination with other substances. Research and science in chemistry long ago revealed that certain fruits contain within themselves a substance which forms a base for making fruit products which have and have had almost universal use. Pectin as a separate substance in certain fruits was discovered by Braconnot in 1825. He gave it the name "pectin" from the Greek word meaning "coagulate." He described the substance and made jellies by the use of alkaline "pectates" isolated from carrots in combination with sugar, a mineral acid and water. Mulder in 1838, and Regnault and Fremy, shortly thereafter, investigated the composition of pectin to establish its structure. These went no further. The physical characteristic of pectin, forming jelly under certain conditions, was known in the art long before the time of the application herein. This knowledge is disclosed in various patents. Mingaud (English, 1865), patent No. 1,649; Scott and McDonald (English, 1878), No. 4,376; Camus (French, 1885), No. 167,436; Jux and Ferrand (French, 1895), No. 244,755; "Goldthwaite on Jelly-Making," 1909. The isolation of pectin for practical use long presented a difficult problem, but this likewise was solved long before Leo's patent. Prior to the invention in suit, the art also taught that pectin went into solution readily when mixed with sugar. Camus, Jux, and Ferrand, Boyles (1913), No. 1,067,714, Barker (1919), No. 125,330. Various publications and studies of the United States Department of Agriculture and other patents disclose this same fact. "Goldthwaite on Jelly-Making," 1909–1914. The jellifying properties of pectin when mixed with sugar and fruit juices was likewise known prior to the Leo application. Despite the knowledge in the art of the properties of pectin, its method of isolation, its method of solution and its jellying qualities, its commercial value for use in the making of jelly was not recognized until in or about 1910, and since that date numerous patents have been issued to make the use of pectin commercially practicable. "Though the constitution of these bodies (pectin) is so far from being determined, yet their fundamental characteristic—that of forming jellies under certain conditions—has long been well known practical-

ly. Our quest in the present work is to find the conditions under which this gelatinizing power best manifests itself. * * *" Goldthwaite, 1909. Later patents are directed to this purpose.

It is claimed that Leo first discovered that pectin varied in jellifying strength; that he taught how to standardize or make the pectin used of specific jellifying strength and the addition of certain proportion of finely divided sugar to dissolve the pectin; that he made it practical to put up, under a formula, a mixture of sugar and pectin which would jellify a stated amount of sugar. Douglas was the pioneer in the development of a definite formula of a pectin base for jelly making. His work is represented by patents No. 1,235,-666; No. 1,082,682; and No. 1,304,166; issued commencing in 1913. As was said by Judge Hand in Douglas Pectin Corp. v. Armour & Co. (C.C.A.) 27 F.(2d) 814, 815, "his product and process were contemporaneous with a revolution in the methods used by jelly manufacturers." Douglas in his patents found a practical jelly base in the form of a concentrated liquid containing pectin. The Douglas product "Certo" is a household commodity of wide use and proven value. This product is boiled down juice obtained from the apple pomace. It is standardized so that it could be utilized by following a definite formula.

Claim 1 describes a jelly base composed of powdered pectin and sugar; the sugar being finely divided and varying in proportion to the pectin in the ratio of from 1 to 1 to 1 to 50.

Claim 2 describes a jelly base composed of acid, powdered pectin, and finely divided sugar, with the ratio of pectin varying from 1 to 1 to 1 to 50 and the ratio of acid to pectin from 1 to 2 to 1 to 4.

The only difference in these claims is in the inclusion of acid in claim 2. It is understood that the addition of acid is dependent on the absence of sufficient acid in the fruit juice which is utilized in jelly making. These claims are directed only to a mixture such as will render the pectin readily soluble when used in the preparation of jelly.

Claims 3 and 4 contemplate the addition of more sugar to the aforesaid preparation in an amount varying in accordance with the variation in the jellying capacity of the pectin to bring the pectin in combination to a determined jellying strength.

Claims 3 and 4 are not easily understood. As stated by a witness for the plaintiff: "The two problems ('solubility' and 'standardization') are so interlocked that it is hard to separate one from the other. * * *" It may be said that claims 3 and 4 relate both to solubility and standardization.

While Leo claims that he first discovered a variation in the jellying power of pectin, the patent to Scott and McDonald, supra, recites: "Pectin must be used in proportion depending on its jellifying strength, which will vary according to its source and mode of preparation, which may be easily ascertained by trial in each case." Douglas in his patent discloses the same fact. Any question as to the discoverer is not decisive of plaintiff's rights under the patent. The record shows that Leo began grading pectin in or about the year 1920. So far as appears, he was the first who graded powdered pectin.

It will be beneficial to give a practical illustration of the process claimed to be described in the patent. The unit of the grade is the amount of pectin which will jellify one pound of sugar. The various batches of pectin from the various sources are mixed together. The mixture is tested for its jellying capacity. The grade of the mixture is changed by the addition of sugar within the ratio limits fixed in the patent; the sugar so added serving to dissolve the pectin and also to standardize the mixture. If the grade of pectin is 160 and the producer wants to put on the market a jelly base of a strength to jelly 80 pounds of sugar, the grade is reduced to an 80 grade by making a mixture of one-half pectin and one-half sugar. The ratios for dissolving and for standardization are both within the claim limitations. The preparation of the product is further illustrated using a pectin of 80 grade: First mix 6 grams of pectin, 2 grams of powdered acid and 30 grams of sugar, or total of 38 grams. To make jelly, combine this mixture with water or fruit juice and bring to a boil. This dissolves the powdered ingredients. Then add 450 grams of sugar (480 grams are needed to work with 6 grams of 80 grade pectin) and boil to 218° F. As Leo claims, he first found that pectin varied in jellying strength, next that it required definite amounts of sugar to make pectin read-

ily soluble, and then that he had to determine for every grade sold the additional amount of sugar to be added at the time of making the jelly.

We come to the issues in the suit. It seems advisable to consider claims 1 and 2 together, separate from claims 3 and 4, and to consider the contentions of the defendant in the natural order of sequence, rather than the order raised.

■ It is claimed that common knowledge of adding sugar to avoid lumping negatives patentable invention in these claims and that the ratios of sugar to pectin therein specified are practical critical limits. Pectin in its natural state is a gum. Even when pulverized it will not dissolve readily in hot or cold water, but will coagulate in lumps. It may be dissolved in an hour, or upwards, through stirring or mashing, but, if the dry pectin is first mixed with certain quantities of sugar, the sugar acts as a dispersing agent, and, when this mixture is put in water or fruit juice, separates the particles of pectin so that the pectin goes into solution in a few minutes. Long prior to the Leo patent it was known that sugar was an expedient utilized to avoid lumping in various other gums and food products. This was disclosed by prior patents and publications, such as Achor (1911), patent No. 983,014, in mixing chocolate with sugar; Frederickson (1912), No. 1,046,766, in mixing renet ferment with sugar; Gere (1917), No. 1,219,286, in the manufacture of milk products; White (English, 1890), No. 8,018, in manufacturing jelly; Barker (English, 1919), No. 125,330, in the production of pectinous substances; "The Manufacture of Ice Cream and Ices," by Frandsen & Markham (1915); "Cocoa and Chocolate, Their Chemistry and Manufacture," by Whymer (English, 1912); and "Dairy Technology" (1913) by Larsen and one; and various other publications and patents. The fact, however, that sugar is used as a dispersing or dissolving agency in connection with the use of these various other products does not deny patentability. Pectin is an entirely different product. Its composition even to-day is unknown, and its reaction, when mixed with sugar in certain quantities, cannot be said to be such as would be reasonably anticipated by one skilled in the art of manufacturing these other products or using sugar in connection with them.

Leo's original application described the use of a "pectinous substance" mixed with sugar. Barker, No. 1,386,224, disclosed the use of a "pectinous substance" and sugar to form a jelly base, and Boyles, supra, disclosed a jelly base made of "pectin and tartaric acid, in dry, granulated form." The Patent Office rejected the original application as lacking invention "over Barker in view of Boyles." So Leo amended his application to include a jelly base comprising a powdered pectin and finely divided sugar. The invention lies in this mixture, either with or without acid, in a fixed range of ratios.

■ What constitutes invention cannot be comprised within a fixed rule. The statutory definition is general in saying that it applies to "any new and useful art, machine, manufacture, or composition of matter." 35 U.S.C.A. § 31. Simplicity does not spell denial of patentability. "Many things, and the patent law abounds in illustrations, seem obvious after they have been done, and, 'in the light of the accomplished result.'" Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 31 S.Ct. 444, 447, 55 L.Ed. 527; Walker on Patents (6th Ed.) vol. 1, p. 75; and cases there cited. No one to the time of Leo had produced a jelly base on the combination disclosed by him. As Boyles said in his application: "Under the conditions present in domestic jelly making, little is known as to the proportions of the essential ingredients of the materials being worked on. * * *"

■ A presumption of validity arises from the issuance of the patent. "The patent is prima facie evidence of both novelty and utility." Lehnbeuter v. Holthaus, 105 U.S. 94, 96, 26 L.Ed. 939; Diamond Rubber Co. v. Consolidated Rubber Tire Co., supra; Johnson Bros. Engineering Corp. v. Caille Bros. Co. (D.C.) 8 F.Supp. 198; Hartford-Empire Co. v. Obear-Nester Glass Co. et al. (C.C.A.) 71 F.(2d) 539. The weight of this presumption is increased when it appears that cited alleged priority patents were considered by the Patent Office. Prior patents considered on this application were Barker and Boyles. Such presumption is further supported by the commercial success of the patent, Hamilton-Beach Mfg. Co. v. P. A. Geier Co. (C.C.A.) 74 F.(2d) 992; Artcraft Silk Hosiery Mills, Inc., v. Gotham Silk Hosiery Co. (C.C.A.) 72 F.(2d) 47; Smith v. Goodyear Dental Vulcanite Co., 93 U.S. 486, 23 L.Ed. 952,

and by the further fact that competitors took out licenses under it, Wahl Clipper Corp. v. Andis Clipper Co. (C.C.A.) 66 F.(2d) 162.

Prior to 1921 no product consisting of a mixture of pulverized pectin and finely divided sugar for use as a jelly base was on the market. Commencing with 1921, very considerable quantities of such a mixture were put on the market. Commencing from 1921 down to the present time, under different trade-marks, including Pen-Jel, Nutrl-Jel, and Kwik-Set, the Leo Company and its licensees have marketed the Leo products in quantities aggregating upwards of millions of small parcels for domestic use and large quantities in bulk packages. These sales extended throughout the United States. Upwards of several millions of dollars have been realized therefrom. In the Douglas interference, the Patent Office considered the precise question raised here. In effect, the Board of Examiners said that the essential characteristic of the mixture is that it will enter quickly into solution when mixed with water or fruit juices; that it was equally important to find out the proportions of sugar and pectin to be mixed; that such proportion could only be determined by experiments or tests; that the suggestion that of the use of powdered sugar with powdered pectin would be sufficient to one skilled in the art to satisfy him that the sugar would tend to speed up the solution of the pectin is unsound. The Board of Appeals in such interference said: "An essential feature or characteristic of the composition or mixture of pectin and sugar is that the pectin when used in the dry form shall immediately enter into complete solution with fruit-juices or water to form a jelly of normal texture and consistency."

 The contention that ratios of pectin specified in the claim are not patentably critical limits and therefore the claims lack invention cannot be sustained. The ratios in the mixture of sugar and pectin are important elements of the invention. They lend patentability to the claims only in connection with the mixture of powdered pectin and finely divided sugar for the purpose of achieving rapid solubility of the pectin. If patentability depended wholly on the question of whether the ratios were critical limits, the claims would not be patentable. Brady Brass Co. v. Ajax Metal Co. (C.C.A.) 160 F. 84; In re Lilienfeld (Cust.&Pat.App.) 67 F.(2d) 920, cited by defendant, illustrate this principle. The evidence shows that the claim ratios followed by Leo and his licensees in their products are practical ratios within which rapid solution of the pectin is assured. We are not here considering this question in connection with the question of standardization.

Defendant claims that Jell-O anticipates standardization in the presence of solubility. Jell-O is a well-known product. By the simple addition of warm water and then cooling, a fruit or vegetable desert is made. Jell-O is a dry mixture of gelatine, sugar, and a fruit acid. This mixture is described in patents commencing with Cooper, No. 4,084, issued in 1845. The jellying base of this product is gelatine. This is an animal product made from bones and animal tissues. It serves the purpose in Jell-O that pectin does in a base for a jell. It is true that the gelatine in Jell-O is treated in the same way plaintiff treats his pectin. Gelatine, like pectin, varies in jellying strength. The strength of gelatine is determined. Acid and sugar are added to the mixture as standardized and insoluble. These similarities and use, however, do not deny the right to separate patent rights. Gelatine and pectin are not similar or analogous products. There is nothing in the nature of gelatine which would suggest to one skilled in the art the use of methods employed with gelatine to effect solubility and standardization of pectin. Jell-O will not make a fruit jelly. Jell-O and pectin are not equivalents. One is not a substitute for the other. Milligan & H. Glue Co. v. Upton, 97 U.S. 3, 5, 24 L.Ed. 985; American Fruit Growers v. Brogdex, 283 U.S. 1, 51 S.Ct. 328, 75 L.Ed. 801, are inapplicable. The rule as to equivalents is applicable where there is "a mere change of form produced by a mechanical division." This would be illustrated by the powdering of the pectin alone. The patent goes much farther than that. The latter, last above cited, describes a product for preventing decay in fruits. It was held that the patent in suit was anticipated by a prior patent utilizing the same acid for a preservative and the same material for a protective coating. Jell-O does not anticipate the claims in suit.

It is contended that claims 1 and 2 of the patent are anticipated by the patents Jux and Ferrand (French), No. 244,755,

January 30, 1895, and Camus (French), No. 167,436, July 15, 1885. Neither of these patents was cited in the Patent Office. The Jux and Ferrand patent described its process as an improved process for manufacture of concentrated extract of juice of fruits. The method described is: The juice is expressed from the pulp and concentrated to a semisolid consistency; the pectin is separated by alcohol and washed with water and then mixed with sugar, with the proportion of 50 grains of pectin per kilogram of sugar. Camus describes his invention as a concentration and extract of juice of fruits. The process employed is: Grating the fruit, expressing the juice, concentrating it to a syrup consistency, precipitating the pectin by alcohol, washing it to powder, and mixing with sugar in a proportion of 30 grains of pectin to one kilogram of sugar.

Camus and Jux and Ferrand both teach the mixture of pectin with sugar to obtain solubility to form a jelly base. Both are within the ratios stated in claims 1 and 2. Camus and Jux and Ferrand get their pectin from the juice which they pressed from the pulp. The patent in suit says nothing of how the pectin is procured. Leo's patent No. 1,513,615, supra, describes method which may include extraction of pectin from the fruit either before or after the extraction of the juice. How the pectin was obtained, however, is immaterial as regards anticipation. Neither of these patents seems ever to have had any commercial use. This furnishes evidence of impracticability. They were apparently of no commercial value, due, probably, to the fact that only a small quantity of pectin is obtainable from the fruit juice. Principal reliance seems to be had upon Camus, supra, as anticipating Leo. Neither Camus, Jux and Ferrand, nor any of the literature at the time of the filing of the original application herein, taught mixing of powdered pectin with finely divided sugar either as a means of obtaining solubility or standardization in connection with solubility.

The defendant seems to make no point that it does not infringe claims 1 and 2, if valid. It seems to me defendant does infringe claims 1 and 2. There is no dispute that the defendant is now, and has been since July, 1932, selling the product "Welch's Powdered Jel-Aid" at Westfield, in this district, and elsewhere throughout the United States. It is this product which it is charged infringes. It is admitted Jel-Aid "contains pure citrus pectin, fruit acid and corn sugar" and that it at times has been made with different grades of pectin. Two formulas for Jel-Aid are set forth in answer to plaintiff's interrogatory. Each shows an equal number of "jell units," with varying percentages of pectin, acid, and corn sugar. Defendant's product is put up in packages of standard weight of an ounce. Microphotographs of specimens of Kwik-Set and Jel-Aid show the physical identity of the two. The ratio of sugar to pectin in Jel-Aid was within the ranges fixed in claims 1 and 2. Jel-Aid comprises a dry powdered mixture of pectin, acid, and finely divided sugar. Welch has made use of the basic principle of the Leo patent—solubility. This is irrespective of the question of standardization. With a certain grade of pectin, Welch was enabled to put out a recipe to "provide a convenient and quick method for making jelly and to eliminate any guesswork. * * *" Its directions for use of Welch's Jel-Aid states: "There's no guess—no chance—it's always sure." All that Welch did on the problem of rendering the pectin readily soluble was what is declared in the purpose and claims 1 and 2 in Leo's original application.

Claims 3 and 4 are alleged to be invalid because they constitute new matter, and further because no supplemental oath was taken. As regards claim 3, it must be disallowed for the reasons given by the Patent Office when it was filed in its original form. One ground upon which it was then rejected was that it was a substantial duplicate of claim 4. It seems that the amendment thereafter made in no way meets this objection. Comparison of the provisions illustrates the duplication which goes to each entire claim. Analyzing the two, we find that claim 3 relates to a jelly base including (1) a definite amount of pectin; (2) an amount of finely divided sugar, (a) to act as agent to facilitate rapid solution of pectin (b) varying in amount inversely to pectin capacity; and that claim 4 relates to a jelly base comprising (1) a powdered pectin; (2) finely divided sugar; (a) amount determined in accordance with ability to effect solution of pectin; and (b) varying in quantity in accordance with the variation of the capacity of pectin. In the applicant's letter to the Patent Office claimant states claim 4 relates only to the determination of the amount of sugar in relation to its

ability to effect solution of pectin. The claim states: "The quantity of sugar in the composition varying in accordance with a jellifying capacity of the pectin." Read in their entirety, there can be said to be no material difference in these two claims. Whether there is a patentable distinction is not material under the issues raised by the defendant. Such issues are applicable equally to claims 3 and 4.

■ Claims 3 and 4 were added upwards of eighteen months after the original application was filed. No one questions that an amendment to a patent to be valid must be within the scope of the original disclosure. Hobbs v. Beach, 180 U.S. 383, 21 S.Ct. 409, 45 L.Ed. 586; Boyce v. Stewart-Warner-Speedometer Corp. (C.C.A.) 220 F. 118. Whether a so-called amendment is within such scope is not always easily determinable. Claims 1 and 2, concededly, relate to "solubility." Claim 3 contains the limitation, "the amount of sugar varying inversely as the above-mentioned capacity of the pectin with respect to sugar changes. * * *" Claim 4 differs from claims 1 and 2 in the declaration, the "quantity of sugar in the composition varying in accordance with the variation in the jellifying capacity of the pectin. * * *" The above-mentioned provisions in claims 3 and 4 were limitations on claims 1 and 2. Claims 1 and 2 taught simply the use of finely divided sugar in connection with powdered pectin and acid to render the pectin easily dissolvable. They say nothing about regulating the sugar with reference to the strength of the pectin. When the original application was filed, the problem of readily dissolving dry pectin was still unsolved. It was to the solution of this problem that the application was directed. By standardization is meant the reduction of various batches of pectin to a common strength by the addition of sugar, so that a certain quantity of the mixture of pectin and sugar, when used with a standard recipe, will jellify a certain amount of sugar. The plaintiff bases its contention that claims 3 and 4 are within the scope of the original application upon this statement in the patent application: "An object of the invention is to provide a convenient and quick method for making jelly and to eliminate any guesswork in the use of powdered pectinous substances." It does appear that, when Leo filed his original application, he knew that pectin from different batches of the same fruit varied in strength. He had been putting on the market pectin of different grades. This, however, did not necessarily have anything to do with standardization. If his pectin was of 60 grade, he had only to follow the provisions of claims 1 and 2 and he could put out a jelly base which would eliminate any guesswork in its use in jelly making without the necessity of standardizing the pectin. The California's Fruit Growers Association provides the defendant with two grades of pectin. All the defendant is required to do is to make a mixture of pectin and sugar in the proper ratio for solubility and divide it by quantity for packaging. While it may be said that Leo standardized his pectin under the formula laid down in claims 3 and 4, the rights of the patentee are not protected unless the declarations in the claims come within the scope of the disclosure. Claims are what form the basis of the patent. Specifications explain the claims. It is clear that the original application does not claim any method by which to standardize pectin. The specifications are clearly insufficient to sustain a claim therefor subsequently added. The directions for following out the claims should be specific. Health Products Corp. v. Ex-Lax Mfg. Co. (C.C.A.) 22 F.(2d) 286; Holland Furniture Co. v. Perkins Glue Co., 277 U.S. 245, 48 S.Ct. 474, 72 L.Ed. 868. The inference first drawn from the amendment to the specifications is that standardization was included in Leo's prior patent No. 1,513,615. Careful reading of the amendment discloses that this is incorrect, and the fact is that the idea of standardization as such was first disclosed by amended claims 3 and 4.

■ It is necessary to pass upon the question of a supplemental oath. The rule with respect to the necessity for a supplemental oath is definite. If any claim depends for its validity upon the amended disclosure in the specifications, further oath is required. If the additions are amendatory of a disclosure made originally, and if the amended claims properly define the specifications as amended, no further oath is necessary. The plaintiff must stand or fall upon the language of the specifications prior to the amendment thereof. Here, the amendment of the specifications is based upon the alleged discovery that pectin is of varying grades. This discovery was not mentioned in the specifications to which oath was made, nor was a method of standardizing set forth,

nor was any claim included which covered standardization.

■ The ratios specified in the original application have not necessarily any connection with standardization, as is claimed by the plaintiff, but relate to solubility. When Leo's original application was filed, grades of pectin, as then known, ranged from 120 to 160. Proof shows that pectins to-day grade to 230. Variation in the ratio of sugar to pectin from 1 to 1 to 3 to 1 would have covered all grades of pectin known to Leo. It is apparent that the ratio of 50 to 1 was not intended to relate to standardization, and the original application clearly shows that these ratios are for the purpose of solubility. Even did these ratios have any relation to standardization, it would make no difference under the view we take of the purpose of the original application. The additional specifications and claims were not amendatory, but were new matter, and a supplemental oath was necessary. Stewart v. American Lava Co., 215 U.S. 161, 30 S.Ct. 46, 54 L.Ed. 139; Westinghouse Electric & Mfg. Co. v. Metropolitan Electric Mfg. Co. (C.C.A.) 290 F. 661; Hartford-Empire Co. v. Obear-Nester Glass Co. (C.C.A.) 71 F.(2d) 539; Scoville Mfg. Co. v. Radio Corp. of America (D.C.) 9 F.Supp. 239. No supplemental oath was made, and claims 3 and 4 must be held invalid.

In the Douglas interference the Patent Office held claim 4 was patentable over Douglas. There is nothing in the interference proceeding showing that the question of the invalidity of claim 4 for new matter was raised. The Patent Office was concerned solely with the question of priority of invention. So far as appears, the Patent Office assumed that claim 4 was a valid amendment.

There is still another consideration rendering claims 3 and 4 invalid. So-called "standardization" of pectin, as such and standing alone, is not patentable. It would be evident to one skilled in the art that "standardization," so-called, of pectin would normally and naturally be effected by the addition of some substance with the pectin. It would be easily understood that the pectin in one pound of a mixture composed of one pound of a substance, either neutral or of co-operative effect in jelly making, and one pound of pectin capable of jellifying 60 pounds of sugar, would jellify only 30 pounds of sugar. It is elementary that such a procedure divides the pectin in half. In jelly making one skilled in the art would naturally add sugar to change the grade. The sugar enters into the final composition of the jelly. The adoption of a simple expedient to change the jellifying strength cannot be said to be any more standardization than the reduction of a mixture of a day's run of pectin to a single grade.

Pectin was produced in different grades. It was essential to package it in uniform packages. In order to make the packages uniform, it was necessary to use something as a filler. The amount of the filler did not make any difference with results, provided it was within the ratios named in claims 1 and 2. It would seem that this matter of uniformity of the packages was the thing Leo had at first in mind, since he was putting out pectin at grades varying from 20 to 60 and upwards. Securing uniformity in packaging would not constitute invention.

■ Plaintiff claims that standardization in the presence of solubility constitutes patentable invention. This position is untenable. An unpatentable product or process may not be combined with one which is patentable so as to secure for the former the benefits of a patent, unless, as the result of the combination, some new and beneficial result is obtained. The result obtained, however, must be the result of the combination and not merely an aggregate of the functions of the several products or processes each acting separately. Here no novel result results from the combination of standardization with solubility, and, were not claims 3 and 4 faulty for lack of supplemental oath, I would still be constrained to hold them invalid, for the reason that they do not disclose any patentable invention.

It is claimed that Douglas' pectin negatives invention in claims 3 and 4. The Patent Office found that it did not. Since it is found that claims 3 and 4 are invalid as new matter, it is not necessary to decide whether Douglas pectin negatives invention in these claims. However, assuming that they are patentable invention, they are not negatived by Douglas. The question was answered as to claim 4 in the Douglas interference. In effect, it was decided in General Foods Corp. v. Seeman Bros., Inc. (D.C.) 60 F.(2d) 622, affirmed (C.C.A.2) 64 F.(2d) 1013. In that suit infringement of claim 5 of the Douglas patent, No. 1,304,166, which reads: "The

process of making fruit jellies consisting in adding to fruit juice, a given quantity of sugar and a proportional quantity of concentrated fruit pectins sufficient to jellify the mass without prolonged boiling," was in issue. The defendant sold a powdered pectin manufactured by the Skinner Manufacturing Company. It was sold in package form and inclosed a recipe for making jellies. The District Court held that the Skinner recipes, when used in connection with the Skinner powdered pectin, did not infringe. The court pointed out the difference in the use of the two pectins, and held that the Douglas patent did not cover, and was not infringed by, the powdered pectin. The Douglas product was described in Douglas Pectin Corp. v. Armour & Co. (C.C.A.) 27 F.(2d) 814. It is described as a pectin concentrate. This concentrate is obtained by evaporating the excess water from the fruit pomace, resulting in a syrupy viscous extract. The concentrate is tested with a simple sugar syrup to tell whether the concentration is sufficient.

The next contention of the defendant is that claims 3 and 4 are not infringed. It is not necessary to determine this question in view of the holding that claims 3 and 4 are invalid as new matter. However, assuming claims 3 and 4 to be proper amendments to the Leo patent and not new matter, it seems to me that they are infringed by defendant's product Jel-Aid. Welch discloses in Jel-Aid standardization as well as solubility in his product. The formulas for Jel-Aid each show "the quantity of sugar varying in accordance with the variation in the jellifying capacity of the pectin." Jel-Aid contains all the ingredients in Kwik-Set and uses the same within the ratios included in the Leo patent. By its formula Welch standardizes the pectin in all material respects in the same way in which Leo does. Defendant describes its product as Welch's Powdered Jel-Aid "to make better jams and jellies from ripe fruits and fruit juices." Its advertising matter states that Welch's Jel-Aid is pure citrus fruit pectin in powdered form

with fruit acid and corn sugar. The jelly recipe put out by Welch calls for the use of Jel-Aid in the manner of the Leo method. Jel-Aid is prepared within the Leo ratios. Jel-Aid is standardized in the sense that each package contains an amount of pectin of definite jellying strength or capacity. The amount of pectin in each package is regulated according to its grade or capacity; sugar being added to bring the package to the desired weight.

■ There has been no laches on the part of plaintiff in instituting this suit. The selling of Jel-Aid began in October, 1932. Defendant was notified of infringement in March, 1934; suit was instituted May 2, 1934, and the trial had in 1935.

■ Plaintiff has moved that, in the event a decree for plaintiff is granted, the California Fruit Growers' Exchange be bound thereby. This motion must be denied. This is because certain proof has been given bearing upon or going to show laches on the part of the plaintiff in the prosecution of suit as against the exchange. It does appear that the exchange has assisted in the defense of this suit, but, since the exchange is not a party to this suit, the opportunity should be afforded of supporting a defense of laches in a separate suit.

Concluding, I find, as matters of law:

1. That claims 1 and 2 of the Patent in suit disclose patentable invention.

2. That claims 1 and 2 are not anticipated in the prior art.

3. That defendant infringes claims 1 and 2.

4. That claims 3 and 4 are invalid, being new matter not supported by a supplemental oath.

5. That claims 3 and 4 are invalid because neither "standardization" nor "standardization in the presence of solubility" as disclosed is patentable invention.

Findings in accordance with this opinion may be submitted, and, when made, may be and be considered to be a part of such opinion.