**COWLES CO. et al. v. FROST WHITE PA-
PER MILLS, Inc. (AMERICAN PAPER
MACHINERY & ENGINEERING WORKS,
Inc., Intervener).**

District Court, S. D. New York.

March 22, 1948.

Emery, Varney, Whittemore & Dix, of
New York City (Nichol M. Sandoe and
Lucius E. Varney, both of New York City,
of counsel), for plaintiffs.

Kenyon & Kenyon, of New York City
(Frederick Bachman, of New York City,
and J. Edward Shinn, of Flushing, of
counsel), for defendant and intervener.

MEDINA, District Judge.

This case involves alleged infringement
by defendant Frost White Paper Mills,
Inc. and contributory infringement by the
intervener American Paper Machinery &
Engineering Works, Inc. of the method
claims 1, 2, 3, 4 and 13 contained in Patent
No. 2,351,492, of which the plaintiffs are
respectively the assignee and licensee. The
pleadings also present the issue of validity.
The apparatus claims of the said patent are
not involved.

In the manufacture of paper there are
certain preliminary procedures by which
the stock is prepared in readiness for feed-
ing to the paper machines. The materials
used vary considerably and in the aggregate
present problems and difficulties which the
industry has met in various ways. Typical
materials are wood pulp in the form of
laps, rolls, waste paper, which commonly
contains a quantity of dirt and foreign
material, broke, frozen groundwood, and
news-print ends. The preparation of these
materials involves three distinct steps, all
of which were for many years performed
more or less at the same time by the opera-
tion of the old-fashioned Hollander beaters.
It is first necessary to defiber the material,
and to break it down into the individual
fibers; this is called pulping. Hydration,
the second step, is caused by a rubbing and
crushing of the walls of the individual
fibers, which results in a swelling of the
fibers as the absorption of the water takes
place and there also results a fibrillation
of the ends of the fibers, giving them a

brush or broom-like appearance. Another result of the hydration is a generally gelatinous consistency of the stock. Finally, it is necessary to cut the fibers in a manner appropriate for the particular kind of paper to be manufactured. In the course of time the paper making industry followed the general trend of specialization and the Hollander beaters were supplemented by various types of breaker beaters and Jordans.

Prior to the development of the machines hereinafter discussed, there was always a substantial demand for any machine which would more efficiently and less expensively perform all or any of the functions of the traditional Hollanders. The element of time was always a matter of importance and this was likewise true of the saving of labor and power. Any improvement in the thoroughness and dispatch with which the entire operation or any part thereof could be concluded was of great practical utility.

Edwin Cowles, the patentee of the patent involved in this case, became interested in the development of a washing machine which functioned by the operation of a jet which had the effect of removing the dirt and performing the cleaning operation in the small washing machines first developed. Experiments on larger machines with a jet of much higher pressure, and a nozzle having somewhat the appearance of a fire hose, resulted in a fraying of the cloth and fabric which led to the abandonment of the venture. He got the idea, however, that the very thing which caused the fraying of the fabric in a washing machine might be serviceable in connection with the pulping of paper stock. After some years of experimentation with various devices, he abandoned the notion of an apparatus containing nozzles and on October 29, 1940 obtained Patent No. 2,219,571 on an apparatus, among the purposes of which were the treatment of paper stock and "defiberizing" generally. This apparatus consisted of a container in which was a shaft, operated from above, to which was affixed an impeller consisting of a circular disk with two or more grooves either in the top or bottom faces or both. The operation of this grooved impeller at a peripheral

velocity in excess of 2,000 feet per minute was supposed to cause the "defiberizing." The theory of this patent as described therein was: "These jets, impinging on the relatively stationary liquid through which they pass, exert a highly disintegrative effect on any solids immersed or suspended therein."

Mr. Cowles testified that the jets which were thrown from the grooves of this impeller produced a disintegrating effect of the same type as was caused by the fire hose nozzle which ejected a high velocity jet in the washing machine upon which he was earlier experimenting. The patent thus obtained on October 29, 1940 contained seven apparatus claims but no process claims whatever.

The final development was the patent in suit which was issued on June 13, 1944. The apparatus consisted of a vat, the bottom and sides of which had a certain conformation shown in Fig. 1, in which certain fixed directional vanes 5 may be imbedded "to direct the stock which is discharged from the impeller in an upward direction and to restrain to some extent the circulation in a horizontal plane."

An impeller of certain dimensions in proportion to the vat was placed at the bottom of the vat and this "impeller disk" was provided with a number of impeller vanes 14 mounted adjacent to the rim of the disk and projecting upwardly from the upper surface thereof. The specifications provide that "The height of the vanes above the surface of the disk is small relative to the diameter of the disk at the circumference which intersects the mid point of said vanes, and should not exceed a ratio of 1 to 30." The specifications also provide that the impeller should be rotated at a rate sufficient to discharge the stock at the rim of the impeller with a velocity of at least 1,000 feet per minute.

It is repeatedly indicated in the specifications and to some extent also in the claims, that the alleged invention utilizes "the principle of refining and defibering by discharging stock at high velocity through a surrounding body of relatively stationary stock." It is stated that "the desired refining and defibering action takes place along

the surfaces of the body of stock which is moving at high velocity" and reference is made to the earlier patent above referred to by way of explanation of the manner in which this alleged principle of hydraulic shear was developed in the patent in suit to a point of high efficiency.

The method claims involved herein are as follows:

"1. The method of pulping paper stock in batches which comprises introducing the required amount of water into a tank, introducing the entire charge of fibrous material required to produce the desired batch consistency into said tank at one time, and maintaining a vortical circulation with a hollow core in said tank whereby floating solid material is submerged by the action of the vortex.

"2. The method of pulping paper stock in batches which comprises introducing the required amount of water into a tank, introducing a charge of solid fibrous material into said tank at one time, said charge being sufficient to produce a stock consistency in excess of 3% in the finished stock, and maintaining a vortical circulation with a hollow core in said tank whereby floating solid material is submerged by the action of the vortex.

"3. The method of pulping paper stock in batches which comprises introducing the required amount of water into a tank, introducing the entire charge of fibrous material required to produce the desired batch consistency into said tank at one time, maintaining a vortical circulation with a hollow core in said tank whereby floating solid material is submerged by the action of the vortex, and subjecting the solid fibrous material to defibering action at the bottom of said vortex.

"4. The method of pulping paper stock which comprises, creating a vortical circulation with a hollow core in a tank by means of a rotary impeller submerged in the tank with its axis beneath the core of the vortex, said impeller discharging stock outwardly in a direction substantially at right angles to the axis of rotation thereof and feeding and submerging light fibrous material through said core directly to said impeller.

"13. The method of pulping paper stock which comprises discharging an annular disk of stock in a substantially horizontal direction through a surrounding body of stock, maintaining a vortical circulation of the body of stock above said disk of stock with a hollow core leading downward from the surface of the stock to the center of said discharged disk of stock, so that floating fibrous material may be submerged by the action of said vortex, and subjecting the same at the bottom of the vortex to the defibering action of the discharged disk of stock."

The File Wrapper indicates that all these method claims were rejected by the Examiner, after various references and amendments and that the Board of Appeals reversed and reinstated the claims as above quoted.

Defendant and intervener in their proof of the prior art relied upon a number of patents, various prior publications and prior public use. In view of the proof with relation to the Wells Patent No. 2,083,884 and its predecessor and of the two Seaborne Patents No. 1,691,308 and No. 2,129,-789 and the various machines constructed in accordance with the specifications of those patents, with certain modifications, it seems unnecessary to discuss the Jung patent relating to an egg beater, the Werner patent relating to a method of producing emulsoids, the Osius patent relating to a disintegrating mixer for producing fluent substances, the Chace patent, which was a stirrer, and the Curtis patent, which was a device for the manufacture of paper.

The sketch (Exhibit 15) shows a plan view of the Wells two-pronged beater which was operated near the bottom of the tank and served the purpose of an impeller. This same two-pronged beater appears as Fig. 2 in the Wells Patent No. 1,951,684. The pamphlet "Progress" (Exhibit LL) shows a modification of the machine with arrows indicating the circulation; and the date of this pamphlet is definitely fixed at about August 13, 1935. The apparatus was a "beater and pulp selector" and an examination of the pamphlet amply corroborates the testimony of Mr. Wells that it was used for defibering. The double-pronged beater

or impeller is in a horizontal position so that the discharge from the face of this impeller must have been substantially in a horizontal direction and the rotation of this impeller could not fail to give a vortical circulation with a hollow core, which would have a tendency to bring the material down the vortex to the impeller, where it would again be discharged by the centrifugal force generated by the impeller. Numerous other documents, some bearing dates, trace the evolution which resulted in the solid disk-like impeller appearing in Exhibit 9, which shows the different parts of the machines used in the accused method. This impeller differs markedly from the Cowles impeller. It is in the form of a depressed cone on which are six vanes extending from the center of the disk to the circumference of the impeller, diminishing in height from 3 inches at the rim of the impeller to $\frac{1}{4}$ inch at its center. The roughening of the surface of the impeller by these vanes caused a vigorous discharge of material, and inevitably produced a certain amount of vortical circulation. The discharge, however, was not substantially horizontal but downward in the direction of the adjacent portion of the bottom of the tank. It was impossible to determine the exact angle of discharge from the testimony, but from the original drawing (Exhibit QQ) for these impellers it appears to have been something in the nature of 9°. There were no other mechanical contrivances on the face of the impeller or on the sides of the tank similar to those appearing in the Hydrapulpers, which are the plaintiffs' commercial embodiments of the patent in suit.

The Seaborne patents were No. 1,691,308 issued on November 13, 1928 and No. 2,129,789 issued on September 13, 1938. This was an all purpose beater for paper stock. The earlier apparatus contained an impeller operated from below and the later one and some intermediate modifications of the first contained impellers operated from above. All of these impellers or "rotors" had "knives 12" which the witnesses often referred to as "vanes" affixed to the outer edge (Exhibit GG), and they were designed at some stage of the beating operation to function in conjunction with other knives

or vanes of a similar character placed at the bottom of a movable bowl or "stator," which could be raised and lowered. This bowl served the function of a mid-feather and the circulation was facilitated by impeller blades 16 cast integrally with the upper surface of the impeller. A number of photographs supplemented the testimony of witnesses as to the manner of operation of these machines, which were called Vortex Beaters. The usual method of operation was to fill the tank with sufficient water to reach the top of the inner bowl and then the furnish was added. The throat of the knives was opened a space of 2 inches or slightly more and the operation continued until the furnish was sufficiently disintegrated to pass freely between the sets of knives. At this stage the bowl was lowered and the operation continued until the process of defibering, hydrating and cutting had proceeded to the desired extent.

The Bulletin of the Valley Iron Works Co., one of the manufacturers of the Seaborne Vortex Beaters, the publication of which is fixed at August 27, 1935, contains the significant statement, "The stock is carried whirlpool fashion down the center of the tub, pulled by the centrifugal action of the rotor."

There is nothing to indicate that the Board of Appeals were aware that the Seaborne machines were known in the trade as "Vortex Beaters"; nor was their method of operation explained nor any of the advertising material produced, so far as appears.

The preliminary and fundamental question is, What, if anything, did Mr. Cowles invent or discover? Whatever may be the utility of a classification which relates invention to machines and discovery to methods, no proper conclusion on the issues here could be reached without some differentiation between the Hydrapulpers as mere apparatus and the method or process which Mr. Cowles claims to have originated. While the Cowles apparatus claims were not litigated in this case and no adjudication on them is permissible, it is only fair to say that the Hydrapulpers as machines seem to have marked a distinct forward step in the industry. Their simplicity, the complete absence of any mid-feather and

the strong and efficient vortical circulation appear to have been recognized by the industry as something new. The commercial success of the Hydrapulpers which the evidence discloses, while perhaps due in some part to workmanlike and attractive manufacture and substantial and well planned advertising, was probably due principally to the efficient manner in which the defibering was done, the fact that both batch and continuous operations were possible and to the various factors of saving and utility which were referred to by the witnesses.

We are concerned here, however, with method and method alone. What Mr. Cowles claims to have discovered was the so-called principle of hydraulic shear as applied to the defibering of paper stock. As fully and repeatedly described in the specifications of the patent in suit and as testified by him and his experts, the method which he discovered was that of projecting a mass of high velocity stock through a surrounding mass of relatively stationary stock, causing a tearing or shearing along the interface between the high velocity stock and the surrounding relatively stationary stock. The preferred embodiment of this principle in the apparatus was supposed to operate with a high degree of efficiency because of the discharge of a relatively thin annular disk of stock, determined by the ratio between the height of the vanes and the diameter of the impeller at 1 to 30 or less and the operation of the impeller at a speed sufficient to discharge the stock at the rim of the impeller at the rate of not less than 1,000 feet per minute. While neither the thickness of the so-called annular disk nor the speed of the stock is mentioned in the method claim 13 of the patent in suit, it was explained that these details had solely to do with the apparatus claims and that the method as described might be used not only in an apparatus of this kind but in any one of a great variety of ways which ingenuity might devise.

The fundamental difficulty with all this is that the supposed principle of hydraulic shear and the theory of a tearing and disintegrating effect produced by the discharge of a mass of high velocity stock through a surrounding mass of relatively stationary stock were completely demolished at the trial. While the so-called annular disk proved to be nothing more than a continuous discharge at the rim of the impeller due to the powerful centrifugal force generated by the impeller, this was a mere matter of phraseology; and the patentee was entitled to use his own descriptive terminology. Aero Spark Plug Co. v. B. G. Corporation, 2 Cir., 1942, 130 F.2d 290, 291; H. J. Wheeler Salvage Co. v. Rinelli & Guardino, D.C.E.D.N.Y.1924, 295 F. 717, 727; Jones v. Sykes Metal Lath & Roofing Co., 6 Cir., 1918, 254 F. 91. The testimony of Professor Ralph Oliver Vuilleumier, however, was to the effect that there was not enough difference in velocity between the layers of fluid to do any defibering because of the viscosity of the fluid particles, which have a tendency to drag one another along, and that the infinite number of fluid layers and the relatively small difference in velocity between one layer and another were such as to present no such interface between the layers as was claimed by the patentee. Calculations of the velocity gradient and numerous experiments during the trial gave ample support to the testimony of this witness. He stated that the excellent defibering done by the Hydrapulpers was entirely mechanical in character and was due to the violent beating action of the metal surfaces of the impeller and the further beating action of the stock against the sides and bottom of the vat. He categorically denied that any substantial defibering took place by hydraulic shear adjacent to the rapidly revolving vanes. Referring to the testimony of plaintiffs' expert that "the real work is done right next to the vane, it is the discharge right off the vane," Professor Vuilleumier stated "that is the portion of his testimony that I disagree with completely."

Professor Vuilleumier was an impressive witness. His qualifications in the fields of hydrodynamics and fluid mechanics were not challenged, nor could they be with any show of reason. Despite the fact that many other experts in this particular specialized field were doubtless available, none was produced. The witnesses arrayed against Professor Vuilleumier had neither

his qualifications nor the support of such clear, scientific data.

It is argued with great earnestness that method claim 13 constitutes something sufficiently new and useful to be patentable, despite the fact that the principle which is alleged to be the basis of the method is held to be scientifically untenable. The difficulty with this argument is that not only do the specifications make the so-called principle of hydraulic shear and the alleged new process completely interdependent, but the phraseology of claim 13, which is the principal subject of this litigation, does the same thing. All of the preliminaries lead to the concluding phrase "subjecting the same at the bottom of the vortex to the defibering action of the discharged disk of stock." As it now appears that there is no substantial "defibering action of the discharged disk of stock," method claim 13 must fall.

■ It is true that a patentee is not required to understand the principle upon which his invention is based, Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 1911, 220 U.S. 428, 435, 436, 31 S.Ct. 444, 55 L.Ed. 527; Katz v. Horni Signal Mfg. Co., 2 Cir., 1944, 145 F.2d 961, 963, and that he may make errors in describing his method, as long as it does what he claims for it, Chipman Chemical Engineering Co. v. Reade Mfg. Co., D.C.D.N.J. 1932, 56 F.2d 1048, yet when his alleged invention is a method based upon an untenable principle and which cannot accomplish the purposes claimed for it, it cannot be patented.

The principal but not the only objection to method claims 1, 2, 3 and 4 is that they involve no invention whatever. As was amply demonstrated by the mass of evidence relative to both the Seaborne and Wells machines in their various forms, the "vortical circulation with a hollow core" and the effect of such a vortical circulation in the submergence of furnish were matters of common knowledge in the industry long prior to the time when Mr. Cowles utilized this elementary principle in either of his patented devices. The testimony of Professor Vuilleumier, supplemented by his various experiments, showed that the vortical and vertical circulations induced by a rotating impeller of any size or shape were well and commonly understood and were inherent in the operation not only of the Seaborne and Wells machines, but numerous others set forth in the prior art patents received in evidence.

As the record may come before the scrutiny of an appellate court, which may take a different view of the foregoing, it may be helpful to discuss the further questions of anticipation and infringement.

■ On the subject of anticipation, it is interesting at the outset to observe that, had the Seaborne Vortex Beaters been constructed and operated subsequent to the issuance of the patent in suit, the method of operation would clearly have constituted infringement if one assumes the premises upon which the Cowles method claims are constructed; and it is well settled that what would infringe if later, anticipates if earlier. Peters v. Active Manufacturing Co., C.C.S.D.Ohio, 1884, 21 F. 319, 321; American Fruit Growers, Inc. v. Brogdex Co., 1931, 283 U.S. 1, 51 S.Ct. 328, 75 L.Ed. 801. The vortical circulation caused by the rotation of the impeller disk is identical with that of the Hydrapulpers; the discharge of stock horizontally through the throat of the knives does not differ in character from the discharge of the so-called annular disk of stock by the Cowles impellers; and the circulation outward, upward and downward, is identical. The only differences are not in the method but in the physical construction of the apparatus. The same may be said of the various Wells machines described in the testimony. The type of impeller, a two-pronged beater, is different and various parts of the device are different but the method of combined vortical and vertical circulation is identical; and the effect of these two circulations in combination is to deliver the material into the zone where much of the defibering takes place.

It is argued that the Schulte patent, with respect to which no prior use was shown, also constitutes an anticipation. Perhaps there may be something in this contention with respect to some features of the Schulte patent. Reliance was more particularly

placed, however, upon Figs. 5 and 6 with respect to which Schulte stated in his specifications "in a somewhat modified form, as shown by Figs. 5 and 6 the above described apparatus may be used for mixing and bleaching instead of disintegrating." While the small model (based on Figs. 5 and 6) produced in court shows a vortical and vertical circulation, a distinct hollow core leading down to the face of the impeller and a horizontal discharge of high velocity material from the rim of the impeller when in operation, the dissimilarity in the purpose of the machine from that described in the patent in suit, and the fact that the patentee regarded the apparatus shown in Figs. 5 and 6 as more of a mixer than a disintegrator, would seem to support the contention of plaintiffs that this patent does not constitute a valid anticipation. It is conceded that none of the other patents in the prior art have any bearing other than upon the general subject of invention.

■ The prior use of the Wells machines and the Seaborne Vortex Beaters would seem to be proved by documentary and other evidence amply sufficient to meet the rigorous requirement of "a very high degree of proof." Douglas Pectin Corporation v. Armour & Co., 2 Cir., 1928, 27 F.2d 814, 821; Smith v. Hall, 1937, 301 U. S. 216, 233, 57 S.Ct. 711, 81 L.Ed. 1049; Perfect Tailboards, Patented v. National Bent Steel Corporation, D.C.E.D.N.Y.1939, 27 F.Supp. 550, 552, 553.

Again assuming the premises upon which the Cowles method claims are constructed, was there infringement? As the impeller of the accused machine is conical with the apex upward, so that its sides form a gentle angle with the base, it is difficult to conclude that the discharge of stock was "in a substantially horizontal direction."

■ The method of operation of the accused machine was the subject of testimony by many of the witnesses; it was shown by the movie exhibited in court; and appeared also in the view of the operation of the machine by the court and counsel at the Frost White mill. At the preliminary stage of operation there was a hollow core vortex but this slowly disappeared; and, in the major part of the operation, there was no vortex at all, and the entire surface of the stock was for quite some time flat and substantially motionless. While even a brief use of a patented method may constitute an infringement, Shimadzu v. Electric Storage Battery Co., D.C.E.D.Pa.1940, 35 F.Supp. 745, provided it is not of trifling importance, Condenser Corporation of America v. Micamold Radio Corporation, 2 Cir., 1944, 145 F.2d 878, there was no infringement by the amount of hollow core vortex which appeared in the operation of the accused machine. An essential part of the Cowles method claim 13 is that the pulping is done by "maintaining" a vortical circulation leading downward to the impeller. It could scarcely be said that a hollow core vortex is "maintained" when it lasts only for a brief period of time, during a preliminary part of the operation and at a time when only part of the furnish has been supplied.

■ An essential part of the Cowles method is the submergence of the floating fibrous material by the action of the vortex. But the proof is that, in the operation of the accused machine, the furnish is submerged only with the help of long poles which are used by the beater men for the purpose of pushing down the floating material, which otherwise remains upon the surface. For these reasons it must, accordingly, be concluded that there was no infringement.

■ The earlier Cowles patent on the apparatus with the grooved impeller contained no method claims whatever, and it was for the greater part of 1940 co-pending with the patent in suit. The contention that there was double patenting must, accordingly, be rejected. General Tire & Rubber Co. v. Fisk Rubber Corporation, 6 Cir., 1939, 104 F.2d 740, 745; Hartford-Empire Co. v. Obear-Nester Glass Co., 8 Cir. 1934, 71 F.2d 539, 561; Century Electric Co. v. Westinghouse Electric & Mfg. Co., 8 Cir., 1911, 191 F. 350, 353, 359, 360; compare In re Zenk, 1920, 50 App.D.C. 25, 267 F. 327, 328.

There remain a number of points, of a highly technical nature, which represent no more than legal conclusions to be drawn

from the facts above outlined. They depend to some extent upon various hypotheses; and it would seem to be more sensible to let the matter rest without further discussion.

█ Careful consideration has been given to the subject of an award of reasonable attorneys' fees to the prevailing parties. 35 U.S.C.A. § 70 as amended in 1946. Under the circumstances of this case there seems no basis whatever for the exercise of discretion in a manner which would place any further burden upon plaintiffs; and no award of attorneys' fees to the prevailing party will be made.

█ The complaint is dismissed and on the counterclaim judgment will be entered declaring the invalidity of claims 1, 2, 3, 4 and 13 of the Cowles Patent No. 2,351,-492.