**COWLES CO. et al. v. FROST–WHITE PAPER MILLS et al.**

No. 159, Docket 21209.

United States Court of Appeals Second Circuit.

May 25, 1949.

Emery, Varney, Whittemore & Dix and Stephen H. Philbin and Nichol M. Sandoe, New York City, for appellants.

Kenyon & Kenyon and Frederick Bachman and J. Edward Shinn, New York City, for appellees.

Before L. HAND, Chief Judge, and SWAN and CLARK, Circuit Judges.

L. HAND, Chief Judge.

The plaintiff appeals from a judgment, dismissing its complaint in an action for the infringement of Claims one, two, three, four and thirteen of Patent No. 2,351,492 issued on June 13, 1944, to Edwin Cowles. Judge Medina has written a careful and thorough opinion,[1] setting out all the facts in such detail that we need not restate them; in what we have to say we shall assume an acquaintance with it and we adopt it as a statement of the facts, so far as we do not consider them independently in what follows.

As long ago as 1893 Schulte, an Austrian inventor, disclosed a machine which could have been used to "defiber" "raw stock" by substantially the same process as Cowles.[2] In Figures 5 and 6 and their explanatory text[3] he disclosed two concentric "casings," each open at the top, the top of the inner one lower than that of the outer, the inner casing "resting firmly" on the outer. The inner casing opened at its base upon "a wheel, J, having vanes which extended from the center in straight or curved lines" which was "employed for the purpose of effecting the circulation of the stuff in the apparatus." It is plain from earlier parts of the disclosure that the stock is to pass through the inner casing, to be thrown out by the "wheel, J" into the base of the outer casing, to pass up against its inner wall, and to return.[4] Schulte disclosed these figures as alternatives to his first four figures, which contained macerating knives in a "grinding block," against which the stock was forced; and it was by this earlier method that he expected the "commination or disintegration of the

[1] 77 F.Supp. 124.
[2] Pat. No. 492,239, issued February 21, 1893, to Hermann Schulte.
[3] Page two, lines 12-23.
[4] Page one, lines 48-56.

fibrous substances" to take place; of Figures 5 and 6 he said that they "may be used for mixing and bleaching instead of disintegrating." Had Cowles' patent been only for the machine which he disclosed, we cannot see how it could have survived Schulte, long as was the interval between the two. Although Schulte did not suggest that the use of Figures 5 and 6 would also "defiber" the stock, they would in fact do so without change; all that was needed was to speed up the velocity of the "rotor." The fact that one cannot get a valid patent for new uses of an old machine is not because of any constitutional limitation upon the power of Congress, for a new use may well be a "discovery" of the highest originality and value; but because the statute authorizes patents only for an "art, machine, manufacture, or composition of matter,"[5] and a machine remains the same machine, however used. A process may be patented because it is an "art" and "an art is an act, or a series of acts, performed upon a subject-matter, to be transformed or reduced to a different state or thing. The machinery pointed out as suitable to perform the process may or may not be patentable; whilst the process itself may be altogether new, and produce an entirely new result."[6] Moreover, although the mere operation of a machine may not be patented as a process if the machine can be used to perform only one process, when it can be used to perform a number of processes, one of these may be patentable.[7] Since it was possible to use Schulte, not only to "distintegrate," but to "mix and bleach," the discovery of its use to "disintegrate" was the invention of a new process, and Schulte was not an anticipation. Yet it did limit the scope of Cowles' advance to the discovery that Schulte's machine could be made without change to "disintegrate" the stock.

Although in their structure Seaborne's two patents[8] did not parallel Cowles' as closely as Schulte's, in specified operation they disclosed a process which was closely akin, if indeed not identical. Thus in the first patent, after the "bowl B" had been closed down upon the "plate," or "rotor," "the arms or blades A[2] will cause any masses or accumulations of pulp within the bowl to be circulated and repeatedly moved within the bowl, until such masses are broken up and reduced to such condition as to pass freely between the beater knives."[9] In line with this the "Wicker Article" declares that "large agglomerates are torn apart before they are forced between the knives and hence there is no possibility of difficulty corresponding to jumping or bounding of a beater roll." In the words of the plaintiff's brief to "defiber" is to "reduce the stock more or less to its individual fibers"; and the process set up in the bowl after it has been lowered is a stage of that process which Cowles completes. At most what he did was to discover that it was not necessary, in order completely to "defiber" the stock, to pass it between the upper and lower set of teeth which Seaborne had provided. However, since Seaborne did not divide the whole process into its three parts—"defibering," "cutting" and "hydrating"—but performed them all in one machine, it is hazardous to assume that, had he wished to limit his machine to the first, he would have thought it necessary to provide the knives. Moreover, it cannot be urged that, standing alone, the concept of separating the treatment of the stock into three processes would support a patent.

Be that as it may, Judge Medina found that the process of "defibering" began before the bowl was lowered. During that phase—that is, while it was raised, as it is at the outset—the water and stock circulated between the knives on the under side of the bowl, and those on the upper side of the plate, and returned over the edge of the "bowl" forming a vortex which even uncovered the worm. This went on for

---

[5] Gillman v. Stern, 2 Cir., 114 F.2d 28; Old Town Ribbon & Carbon Co. v. Columbia Ribbon & Carbon Mfg. Co., 2 Cir., 159 F.2d 379; § 31, Title 35 U.S. C.A.

[6] Cochrane v. Deener, 94 U.S. 780, 788, 24 L.Ed. 139.

[7] Carnegie Steel Company v. Cambria Iron Company, 185 U.S. 403, 424, 425, 22 S.Ct. 698, 46 L.Ed. 968.

[8] Pat. No. 1,691,308, issued Nov. 13, 1928. Pat. No. 2,129,789, issued Sept. 13, 1938.

[9] Page two, lines 117-123.

some ten to fifteen minutes, "until the stock was reduced to a flowable condition * * * during which some defibering took place." This finding was based upon the testimony of Wells, Radsch and Furminger. Wells said that the bowl was raised four to six inches; that a charge was added of between 1500 and 2000 pounds; and that a "hollow core vortex" arose in the bowl in which the stock would "work around" until they became small enough to pass between the knives—still separated as they were. This was continued for ten or fifteen minutes and the effect upon the stock was to defiber it. On cross-examination he said that he had seen the same phenomenon twice in a machine made under the first Seaborne patent, and on redirect that that machine "did a good defibering." Radsch, in speaking of the machine made after the second patent, said that the bowl was raised to allow free passage of the water and the stock between the knives of the bowl and the plate so that they had practically no action on the stock; and that it was only after the stock had been "disintegrated thoroughly" that the bowl was lowered and the knives of the bowl and the plate brought into contact. He thought it was the vortex motion, produced by the rotation of the plate, that caused the disintegration. Furminger was less explicit. All he said was that the plate was operated for a time while the bowl was raised and that this "had a tendency to circulate and break up the stock" and that "as the stock is being disintegrated they lower the stator" (the bowl).

A question may be raised whether this testimony should satisfy the severe test demanded to establish a prior use.[10] Even in its last decision on that issue the Supreme Court said that testimony, at least when it was that of a rival inventor, "without corroboration * * * is insufficient to establish prior use."[11] That was, however, in 1937, and it may be doubted whether in view of the changed attitude towards patents in the last twelve years, so strict a standard would any longer be enforced. Besides, the doctrine was never quite so absolute when the testimony was not that of a rival inventor.[12] We have ourselves[13] explained what we said in Block v. Nathan Anklet Support Co.[14] as not meaning that documentary confirmation is a condition, sine qua non, and in the last decision we have found the Fifth Circuit[15] accepted a less stringent standard. Wells must, it is true, be regarded as a rival inventor, but Radsch and Furminger were not subject to his discount. Moreover, the question is whether the process which confessedly goes on in the inner bowl after it is lowered, does not go on in the outer bowl as well before it is lowered. We think that the finding was adequately supported and that it invalidates claims one, two, three and four. Certainly, it was not a patentable invention if "some defibering took place" in the initial phase to continue the process so begun, especially when the inventor was using a single machine for the three processes.

Wells' patents[16] are not as close to Cowles as Seaborne's, and we need not rely upon them. Nevertheless they did disclose a defibering "vortex," coupled with a beater which "assists materially in disintegrating" the stock. Like Seaborne in his second machine, Wells disclosed a screen and screw "impeller" to assist the circulation of the whole mass. This later proved unnecessary, and in any event its presence appears to us of no moment.

As we understand it, the plaintiff regards claim thirteen as the kernel of the invention; its decisive contribution to the

[10] The Barbed Wire Patent, 143 U.S. 275, 284, 12 S.Ct. 443, 36 L.Ed. 154; Deering v. Winona Harvester Works, 155 U.S. 286, 300, 15 S.Ct. 118, 39 L.Ed. 153; Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 60, 43 S.Ct. 322, 67 L.Ed. 523.

[11] Smith v. Hall, 301 U.S. 216, 222, 57 S.Ct. 711, 714, 81 L.Ed. 1049.

[12] Corona Cord Tire Co. v. Dovan Chemical Co., 276 U.S. 358, 382, 48 S. Ct. 380, 72 L.Ed. 610.

[13] Turner Dock Transfer Co. v. Terminal Engineering Co., 94 F.2d 79.

[14] 9 F.2d 311.

[15] Zachos v. Sherwin-Williams Co., 166 F.2d 79.

[16] Pat. No. 195,684, issued March 20, 1934.

Pat. No. 2,083,884, issued June 15, 1937.

872

art is the "annular disk of stock" projected "in a substantially horizontal direction through a surrounding body of stock." This action is disclosed in some detail at the beginning of the specifications, together with the supposed advantage of the discharge of such a "thin annular disk" over that through a pipe, circular or rectangular. However, the only description of how this is to be done is that the discharge of the stock at the rim of the rotor must be at a velocity of at least 1000 feet a minute. Higher velocities may at times be necessary if the stock be "tough"; and at lower velocities defibering will be slow and in some cases will never be completed at all.[17] Much evidence was taken as to this shredding or tearing action of such a disk thrown out at high velocity; its very existence was in dispute and concededly was hard to ascertain. Cowles' testimony was most unsatisfactory; Kelley, the plaintiff's expert, was scarcely a match for the defendant's expert, Vuilleumier; and Seaborne and Furminger were merely guessing. Vuilleumier categorically stated that defibering was all done by the vanes on the rotor and by the sides of the tank, and his testimony completely convinced Judge Medina. We should be altogether unwarranted in declaring the statement in his opinion "clearly erroneous" that the theory was "completely demolished." Moreover, that aside, the claim is invalid anyway. A patent cannot rest upon a theory; a process patent is for a "series of acts," and it is the series that must be new. It was proved, again to Judge Medina's satisfaction, that the velocity of the discharge from the rotor of the Seaborne machines was as great as 1000 feet a minute, and that was an anticipation so far as concerned this feature of the invention. Finally, all that the specifications disclose, as we have said, is that the faster the rotor rotates the speedier will be the defibering; that the necessary speed is a function of the "toughness" of the stock; and that at speeds of less than 1000 feet at times it will be impossible completely to defiber some stock. When all is said, this comes to no more than that the faster one rotates the rotor, the quicker the result. That was not a

patentable contribution to the art; and the claim is invalid.

Article four of the judgment is, of course, to be understood as referring only to suits for infringement brought by the plaintiffs against users of the defendants' beaters, or beaters substantially identical.

Judifment affirmed.

---

[17] Page two, col. two, lines 1-22.