## VAN DER HORST CORPORATION OF AMERICA v. CHROMIUM CORPORATION OF AMERICA.

No. 178, Docket 22245.

United States Court of Appeals, Second Circuit.

Argued Feb. 5, 1952.

Decided May 20, 1952.

Rehearing Denied Aug. 21, 1952.

See 198 F.2d 748.

Jeffery, Kimball & Eggleston, New York City, J. Stanley Preston, New York City, argued, Jerome G. Lee, New York City, of counsel, for appellant.

Burgess, Ryan & Hicks, New York City, Newton A. Burgess, New York City, argued, H. H. Hamilton, New York City, for appellee.

Before SWAN, Chief Judge, and L. HAND and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

█ The opinion of the District Court is reported in 98 F.Supp. 412, and contains a very full statement of the issues involved, the facts found and the supporting evidence; we shall assume an acquaintance with it in what we say, and we do not think it necessary to repeat its substance. Moreover, we shall confine our discussion to only one of the issues decided below, for, even though we should hold with the plaintiff on all other issues, the judgment would have to be affirmed, if, as we believe, the claims in suit are invalid because they are not for any patentable advance over the prior art. Hence we shall not consider the question with which so much of the argument has been concerned: *i. e.* how much may an application change its disclosure and still be for the "same invention"? We shall take February 21, 1939 as the date of Van der Horst's invention, that being the date of filing of his second British "Provisional Specifications"; but we shall ignore the first "Provisional Specifications," filed September 3, 1938, because these concededly described the invention too indefinitely to identify it with the eventual patent. Before considering the prior art, we should say how we read all but Claim 4 of the claims in suit. In Claims 6, 22, 26 and 27 the "wearing member" is to contain "small depressions" whose "bottoms" shall not be smooth: *i. e.* shall contain "irregularities" or "projections"; and we shall speak of these as the "Valley Claims." Of them Claim 27 is the only possibly important variant; it prescribes a maximum "pit" depth of "about" .003 of an inch; and since Cleveland's minimum "pit" depth is .002 of an inch, it overlaps Cleveland; and a patent claim cannot be good in part and bad in part.[1] Claims 9, 13, 23, 24 and 25 are for the surface dimensions of the "pits," and we shall speak of them as the "Area Claims." Claim 13 makes the "pit" depth of these an added feature; but, since it adds nothing to Claim 8,—itself an "Area Claim,"— except that the "pits" shall be more than .0002 of an inch in depth, we may disregard it, because, as we have just said, Cleveland's "pits" were all at least .002 in depth. The "Area Claims" are, however, all distinguished from Cleveland's "press-roll" by the fact that they require the presence of "some" "pits" which are less than .004 of an inch in width; and none of Cleveland's "pits" are less than .005 of an inch.

With this preliminary we may proceed to the effect as prior art of Cleveland's Patent No. 2,114,072 issued April 12, 1938. it was not for a "wearing member * * * to operate in frictional contact with an-

---

1. § 65, Title 35, U.S.C.A.; Miller v. Monarch Printing Co., 8 Cir., 285 F. 364; United Lens Corp. v. Doray Lamp Co., 7 Cir., 93 F.2d 969, 972.

other wearing member"; on the contrary it was for a "press-roll"—a chromium faced cylinder, which should squeeze the water out of paper pulp between itself and a felt cylinder. It is extremely doubtful whether we may read the phrase, "to operate in frictional contact with another wearing member," to include the second "wearing member" as one element of a patented combination. However, conceivably that may be proper, especially in view of the passage in lines 20–25 of column 3 of the specifications; and at any rate, we shall assume *arguendo* that the phrase does not merely describe how the first "wearing member" may be used, but is for a combination of it with a coöperating "wearing member." If so, the claims are not for a new use of Cleveland's "press-roll." On that assumption they could be valid for two reasons: (1) because of the physical differences between them and Cleveland; (2) because it demanded invention to conceive of combining the "press-roll" with a second "wearing member."

After what we have already said about the "Valley Claims," it is clear that their only physical differences from the "press-roll" lie in the fact that they assume that, when the chromium is eaten away by reversing the electrolytic current, the bottom of the "pits" will not be smooth, but corrugated, or "irregular" as the specifications describe them. It is very strange that these corrugations should have ever been made an element of any claims whatever, for Van der Horst himself swore that he did not "believe they have any purpose or usefulness," but "would form some slight danger"; indeed, he spoke of them as "a necessary evil." Not only did they contribute nothing to the claims in which they appear, but, if they had, there is no reason to suppose that "pits" produced by sandblasting do not have bottom surfaces as "irregular" as those of "pits" produced by reversing the current. Cylinders which the defendant made in 1946 and 1948 by sandblasting were not "perfectly smooth at the bottom," and if that was the result of sand-

blasting then, it must have been the result of sandblasting ten years earlier. Hence the "Valley Claims" can only depend upon a combination of Cleveland's "press-roll" with a second "wearing member" as *per se* patentable. As we have said, the "Area Claims" do have a physical difference from Cleveland's "pits" because the lower limit of the diameter of all Cleveland's "pits"—"indentions" (*sic*)—was .005 of an inch, and "some" of Van der Horst's "pits" must be of a diameter "less than about .004 inch." However, although it would not be true to say that Cleveland's claims overlap Van der Horst's, there is no justification for a patent, based upon the condition that "some" of the "pits" must be .001 of an inch narrower than any of Cleveland's. The record does not contain any evidence that the presence of some "pits" of .004 of an inch makes the "wearing member" operate better than if they were .005 of an inch; and in any event the judge found that the sandblasting process of Cleveland will in practice produce "pits" of less than .005 of an inch. At most all that can be said for this physical difference is that Van der Horst perceived that some "pits" of less than .005 of an inch might be an advantage. One cannot get a patent for that unless one can attribute some industrial benefit to the change."[2] Therefore, like the "Valley Claims," if they are to survive, it must be because it required invention to make a self-lubricating engine cylinder by combining Cleveland's "press-roll" with a second "wearing member."

We need not say, if the art had not already disclosed such a combination, that to conceive it could not have supported the claims. Perhaps it could; but the trouble is that the combination had been already invented by Stokes, whose "Provisional Specifications"—which eventually appeared in British Patent No. 521,572 of 1940—were filed on November 22, 1938, earlier than Van der Horst's earliest date. These were letter for letter the same as Stokes's "Complete Specifications" with the single exception of lines 62–65 of page three

**2.** Foxboro Co. v. Taylor Instrument Companies, 2 Cir., 157 F.2d 226, 233.

which are irrelevant. Under the doctrine of Alexander Milburn Co. v. Davis-Bournonville Co., 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651, the pendency of an earlier application in a patent office makes the applicant a "prior inventor" under the Patent Act[3]; moreover, the application is itself for all purposes the equivalent of a printed publication: that is to say, its anticipatory effect is not confined to the very letter of the disclosure, any more than is that of a printed publication.[4] We are therefore to judge the validity of the claims in suit—even though we follow our assumption that they are combination claims—as though Stokes's British Patent had been published in November, 1938. If so, the claims are anticipated by the following passage from Stokes's specifications—page three, lines 76–82—: "The smoothed surface is then artificially de-smoothed by shot blasting, or, alternatively knurling, followed up if necessary by further honing until the depressions * * * have been reduced in depth to the order of two to three thousandths of an inch." On this "de-smoothed" surface the chromium is then electrolytically deposited, and the surface of the chromium layer "is characterized by a number of minute depressions which act as oil reservoirs"—page three, lines 92, 93. Here was everything but the precise details of the "pits' " areas, and these Cleveland had disclosed with the approximations that we have already discussed. Incidentally, the art had to wait less than four months for a substantially literal anticipation of the claims, as appears from Patent No. 2,248,530 to Granger and Cleveland which was applied for on June 5, 1939. Such a quick sequence forbids any inference that, even though we were to ignore Stokes, the hypothetical combination was not ready for immediate birth.

█ There remains Claim 4 which, however, needs no extended discussion. It is even more difficult than in the case of the other claims to construe this as a combination claim; it would do great violence to the phrase, "a member having a surface to engage in moving contact with another member," to read it as describing the combination of the pitted member with "another member." If so, we do not have the problem whether the combination demanded patentable ingenuity, which our hypothetical interpretation of the other claims has raised, for, unless read as a combination claim, Claim 4 would be invalid as a patent for a new use.[5] Besides, even though we were to read it as a combination claim, Claim 4 would not serve the plaintiff's purpose, for it is for an article which shall be the same as the product of the process patent (though it need not be the product of the process). As such, it reduplicates the later claims, so far as these are descriptions of the product of the process; and, so far as the particulars which they interpolated added any new elements as conditions, Claim 4 is broader, and a broader claim must necessarily fail if a more limited claim has failed. From the foregoing discussion it appears that all the claims are invalid because, as we said at the outset, any advance—if it can be so described—which they made over the art as it stood in February, 1939, consisted of no more than trifling variants of what had already been invented. We do not mean to intimate that the claims are not also invalid because of the public use of the product for more than a year before February 22, 1943, but we welcome the escape from the fog that surrounds any answer to the question as to when a changed disclosure is for the same, and when it is for a different, invention. Whether that comes up over reissues or amendments in the Patent Office, it always results in periphrases to which we are not disposed to add.

Judgment affirmed.

3. § 69, Title 35, U.S.C.A.

4. Western States Machine Co. v. S. S. Hepworth Co., 2 Cir., 147 F.2d 345, 348, 349; Kendall Co. v. Tetley Tea Co., 1 Cir., 189 F.2d 558, 563.

5. Cowles Co. v. Frost-White Paper Mills, 2 Cir., 174 F.2d 868.